**2022 IL 127037**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————

(Docket No. 127037)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ABDULLAH ALJOHANI, Appellant.

*Opinion filed June 16, 2022.*

JUSTICE GARMAN delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Theis, Neville, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

**OPINION**

¶ 1     In November 2018, the Cook County circuit court found defendant, Abdullah Aljohani, guilty of first degree murder and later sentenced him to 23 years in prison. On appeal, defendant argued, *inter alia*, that the circuit court erred in denying his motion to suppress evidence based on the community caretaking doctrine and that the State's evidence failed to prove him guilty beyond a reasonable doubt. The First

District affirmed, finding the emergency aid exception to the warrant requirement applied and the evidence was sufficient to prove him guilty.

¶ 2　　Now on appeal, defendant argues the circuit court's reliance on the community caretaking doctrine and the appellate court's reliance on the emergency aid exception to the warrant requirement were both in error. He also argues the State's evidence failed to prove him guilty of first degree murder beyond a reasonable doubt. We affirm.

¶ 3　　　　　　　　　　　　　　BACKGROUND

¶ 4　　In April 2015, a grand jury indicted defendant on five counts of first degree murder in connection with the stabbing death of Talal Aljohani (counts I to V) (720 ILCS 5/9-1(a)(1)-(3) (West 2014)). The grand jury also indicted defendant on one count of armed robbery (count VI) (*id.* § 18-2(a)(1)).

¶ 5　　In November 2018, the circuit court conducted a hearing on defendant's motion to suppress evidence. Chicago police officer Banito Lugo testified he and his partner were dispatched at approximately 4 a.m. on March 15, 2015, to a report of a battery in progress. They arrived at a "three-flat building" surrounded by a gate and a chain-link fence. They were met outside the building by Khalid Ali, who said he had heard a loud verbal argument in Arabic between two men on the second floor. Ali, who understood Arabic, stated it sounded like two people wrestling before one individual said, "Are you okay?" and "Get up." Upon hearing this, Ali went upstairs, knocked on the door, and asked defendant if everything was all right. Defendant said it was okay and reported that Talal was in the bathroom.

¶ 6　　Based on their conversation with Ali, Lugo and his partner entered the building and took the stairway to the second floor. The officers knocked on the door, and defendant opened it "[a]bout a foot." Upon questioning, defendant said everything was okay. The officers then asked to speak to his brother, but defendant said he was sleeping. The officers decided to leave, and defendant closed the door.

¶ 7　　Lugo and his partner returned to the first floor and spoke with Ali, who was "adamant" about what had occurred upstairs and that someone was seriously injured. The officers went back upstairs and knocked on defendant's door for about

five minutes. They received no response, returned downstairs, and told Ali to call police if he had any further concerns. The officers returned to their squad car and "punched in a code" that everything was okay.

¶ 8 However, because "[s]omething didn't feel right," Lugo drove around the building to the alley. The officers exited their car and saw the back gate open. Although he did not know how long the gate had been open, Lugo and his partner "[p]roceeded into the yard and found the garage door open." After looking into the garage, they saw the side entrance to the building open. The officers entered the building and went up to the second floor. They saw the apartment door "wide open," knocked, and announced their office. Receiving no response, they entered the apartment and went room to room. Lugo observed a man lying on a mattress in the bedroom and found him unresponsive. Lugo did not see defendant in the apartment. Lugo testified that "[r]oughly" 15 to 20 minutes passed from the time the officers arrived until they entered the rear door of defendant's apartment.

¶ 9 After Officer Lugo's testimony, the defense rested. The circuit court asked counsel what he was seeking to suppress, and counsel said evidence recovered from the apartment that the State would seek to introduce in its case-in-chief, including blood evidence and a broken knife.

¶ 10 In asking the circuit court to deny the motion, the State argued the officers' actions fell "squarely within the emergency aid doctrine." The court indicated it believed Officer Lugo and concluded the circumstances fell "squarely within the community caretaking function." The court denied the motion to suppress.

¶ 11 Defendant then waived his right to a jury trial, and the State proceeded on the first degree murder charges in counts I and II. The parties stipulated that, if called to testify, Officer Lugo would provide the same testimony as provided at the hearing on the motion to suppress.

¶ 12 Abdulhadi Aljohani, the victim's brother, testified Talal came to the United States to attend college. Talal lived with defendant, and although they shared the same last name, they were not related.

¶ 13 Khalid Ali testified he grew up in Somalia and could communicate in Arabic. He lived in the first-floor apartment with his wife and five children. The second-

floor apartment was occupied by defendant and Talal. In the early morning hours of March 15, 2015, Ali heard "wrestling" and "yelling and screaming" from upstairs. He then heard defendant mention the name, "Talal, Talal," and "some panic." That was followed by the sound of "somebody dragging like a leg or something." Ali went upstairs and knocked, and defendant answered. He appeared "normal," said there had been a "small argument," and gave Ali two thumbs-up that "everything [was] okay." Defendant shut the door, and Ali went back downstairs.

¶ 14    Shortly thereafter, Ali returned upstairs via the back staircase and knocked on the door. Defendant answered and said everything was okay. When Ali asked where Talal was, defendant said he was in the bathroom. Ali, however, could see into the bathroom and saw no one. When Ali asked again where Talal was, defendant said he was talking to his family. Ali asked to talk with Talal, but defendant repeated that Talal was talking to family. Ali then asked to see Talal, but defendant "looked a little mad," said "do whatever," and closed the door. Ali returned to his apartment and called 911. When the police arrived, Ali told the officers what he had heard upstairs.

¶ 15    David Ryan, a retired forensic investigator with the Chicago Police Department, testified he responded to the apartment in the early morning hours of March 15, 2015. He entered the apartment and later observed the victim on a bed in the bedroom. In the same bedroom, Ryan found a steak knife with a four-inch-long blade. Detectives also recovered a driver's license and student identification card for defendant.

¶ 16    Kristin Escobar Alvarenga, an assistant medical examiner, testified she performed the autopsy on Talal. She observed injuries to his abdomen, face, neck, chest, and lower right extremity. During her internal examination, she observed a "sharp force injury to his liver as well as the inferior vena cava and the aorta." She opined the cause of death was a stab wound to the abdomen.

¶ 17    Chicago police officer Anthony Acevez testified that on March 17, 2015, he was assigned to follow up on an investigative alert and warrant regarding defendant. While proceeding to the suspect address in an unmarked vehicle, Acevez, who was wearing plain clothes with a police vest, observed an individual matching defendant's description. When they made eye contact, defendant and another individual "immediately began running." Acevez gave chase and ultimately tripped

the individual, who fell into defendant, causing both of them to fall to the ground. Acevez apprehended defendant and took him into custody.

¶ 18        The parties entered a stipulation regarding various pieces of DNA evidence. DNA identified in a bloodstain from defendant's underwear matched the DNA profile of Talal and not defendant. A swab of a bloodstain from the knife blade matched the DNA profile of Talal, and the swab from the knife handle matched the DNA profile of defendant.

¶ 19        Following closing arguments, the circuit court found defendant guilty of first degree murder. In January 2019, defendant filed a motion for a new trial, arguing, *inter alia*, the court erred in denying his motion to suppress evidence and the State failed to prove him guilty beyond a reasonable doubt. The court denied the motion and then sentenced defendant to 23 years in prison on count I.

¶ 20        Defendant appealed, arguing (1) the circuit court erred in denying his motion to suppress evidence because the police officers' warrantless entry into the apartment immediately after the murder was not justified by the community caretaking exception, (2) the court erred in admitting evidence of his flight as circumstantial evidence of his guilt, and (3) the State's evidence failed to prove him guilty beyond a reasonable doubt.

¶ 21        The appellate court affirmed in a modified opinion. 2021 IL App (1st) 190692. On the first issue, the court found the warrantless entry into the apartment fit squarely within the emergency aid exception. As to defendant's flight, the court found it reasonable that his headlong flight from the police was in response to the stabbing death of the victim. On the third issue, the court concluded the entirety of the evidence, including defendant's presence, his flight from the apartment and then again days later from the police, the DNA evidence, the neighbor's testimony, the attempted coverup by defendant, and the circumstantial evidence, was sufficient for a factfinder to find defendant guilty beyond a reasonable doubt.

¶ 22        In March 2019, defendant petitioned this court for leave to appeal, and we allowed that petition. Ill. S. Ct. R. 315 (eff. July 1, 2018).

¶ 23                                    ANALYSIS

¶ 24        Defendant raises two issues on appeal. First, he argues the circuit court erred in denying his motion to suppress, whether it be through application of the community caretaking doctrine or the emergency aid exception to the warrant requirement. Second, he argues the appellate court erred in finding the evidence presented at trial was sufficient to prove him guilty of first degree murder beyond a reasonable doubt.

¶ 25                          I. Motion to Suppress Evidence

¶ 26                              A. Standard of Review

¶ 27        On a motion to suppress, "[a] defendant must make a *prima facie* case that the evidence was obtained by an illegal search or seizure." *People v. Gipson*, 203 Ill. 2d 298, 306-07 (2003). "Once the defendant makes out a *prima facie* case that a seizure was unreasonable, the burden shifts to the State to come forward with evidence to rebut." *People v. Bass*, 2021 IL 125434, ¶ 21. The ultimate burden of proof, however, remains with the defendant. *Gipson*, 203 Ill. 2d at 307.

¶ 28        In reviewing a circuit court's ruling on a motion to suppress evidence on appeal, this court applies the two-part standard of review announced by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996). *People v. Lindsey*, 2020 IL 124289, ¶ 14. Under that standard, "the trial court's findings of historical fact are reviewed for clear error and may be rejected only if they are against the manifest weight of the evidence, but the trial court's ultimate ruling as to whether suppression is warranted is reviewed *de novo*." *Bass*, 2021 IL 125434, ¶ 21. Also, "in reviewing a pretrial suppression ruling, a court may rely on evidence introduced at the ensuing trial." *People v. Kidd*, 175 Ill. 2d 1, 25 (1996).

    "The question before a reviewing court is the correctness of the result reached by the lower court and not the correctness of the reasoning upon which that result was reached. [Citation.] Therefore, as a reviewing court, we can sustain the decision of a lower court for any appropriate reason, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct." *People v. Novak*, 163 Ill. 2d 93, 101 (1994), *abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353 (2006).

See also *People v. Buss*, 187 Ill. 2d 144, 205 (1999) (noting the circuit court's ruling on a motion to suppress may be affirmed "for any reason in the record, regardless of whether the circuit court expressed this reason as a basis for its conclusion"); *People v. Johnson*, 208 Ill. 2d 118, 129 (2003) (stating "[t]he rule that a lower court decision may be sustained on any ground of record is both universally recognized and long established").

¶ 29                              B. Search and Seizure

¶ 30     The fourth amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., amend IV.

¶ 31     Article I, section 6, of the Illinois Constitution of 1970 provides:

"The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall issue without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized." Ill. Const. 1970, art. I, § 6.

"This court has long held that the search and seizure clause of our state constitution stands in 'limited lockstep' with its federal counterpart." *Lindsey*, 2020 IL 124289, ¶ 15.

¶ 32     The United States Supreme Court has said that, "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). The Court has gone on to find that it is a " ' "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable.' "

*Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). This presumption may be overcome in some instances, however, "because 'the ultimate touchstone of the Fourth Amendment is "reasonableness." ' " *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). Thus, certain exceptions have developed through the years.

¶ 33    "One well-recognized exception applies when ' "the exigencies of the situation" make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.' " *King*, 563 U.S. at 460 (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). The Supreme Court has identified several exigencies that may justify a warrantless search of a home, including when police officers are in hot pursuit of a fleeing suspect and to prevent the imminent destruction of evidence. *Id.*; see also *Michigan v. Tyler*, 436 U.S. 499, 509 (1978) (finding warrantless entry onto private property to fight a fire and investigate its cause did not violate the fourth amendment).

¶ 34                                    C. Emergency Aid Exception

¶ 35    The Supreme Court has also found another exigency obviating the requirement for police officers to obtain a warrant—when there is "the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403.

¶ 36    In *Brigham City*, police officers responded to a 3 a.m. call of a loud party at a residence. *Id.* at 400-01. Upon arrival, they heard shouting from the interior and proceeded to investigate. *Id.* at 401. The officers observed two juveniles drinking beer in the backyard and, upon closer inspection of the house, saw through a screen door and windows that an altercation was underway in the kitchen. *Id.* Inside, officers saw four adults attempting to restrain a juvenile, who eventually broke free and swung and hit one of the adults in the face. An officer then observed the victim spitting blood into a sink. Other adults attempted to restrain the juvenile, pressing him against a refrigerator with enough force to move it across the floor. An officer opened the screen door and announced his presence. Nobody noticed, so the officer entered the kitchen and again stated his office. The occupants eventually became aware that the police were present, and the fighting ceased. *Id.*

¶ 37     The officers arrested the respondents and charged them with contributing to the delinquency of a minor, disorderly conduct, and intoxication. The trial court granted the respondents' motion to suppress, finding the officers' entry into the home violated the fourth amendment. *Id.* After the Utah Court of Appeals affirmed, the Utah Supreme Court rejected Brigham City's argument that the injury caused by the juvenile's punch triggered the emergency aid doctrine, finding "it did not give rise to an 'objectively reasonable belief that an unconscious, semi-conscious, or missing person feared injured or dead [was] in the home.' [Citation.]" *Id.* at 401-02.

¶ 38     The United States Supreme Court granted *certiorari* to address the appropriate standard governing warrantless entry by law enforcement in an emergency situation. *Id.* at 402.

> " ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' [Citations.] Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* at 403.

¶ 39     In considering the facts of the case, the Supreme Court noted "[t]he officer's subjective motivation is irrelevant" and that it did not matter "whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence." *Id.* at 404-05. The Court found the officers' entry into the home was "plainly reasonable under the circumstances." *Id.* at 406. The Court noted the officers were responding to a 3 a.m. complaint of a loud party, they could hear and then see an altercation taking place, and they observed a fight in the kitchen. *Id.*

> "In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone 'unconscious' or 'semi-conscious' or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided." *Id.*

¶ 40    Three years later, the Supreme Court considered the emergency aid doctrine again in *Michigan v. Fisher*, 558 U.S. 45 (2009) (*per curiam*). In that case, Officer Christopher Goolsby and his partner responded to a disturbance complaint and were directed to a residence where a man was said to be " 'going crazy.' " *Id.* at 45. Upon arrival, the officers found the property and household in disarray, including a pickup truck in the driveway with its front smashed, damaged fenceposts, and three broken house windows. *Id.* at 45-46. The officers also noticed blood on the pickup's hood and on clothes inside the truck, as well as on one of the doors of the house. *Id.* at 46. Through a window, the officers saw the respondent, Jeremy Fisher, inside the house, screaming and throwing things. The officers knocked, but Fisher refused to answer. They saw he had a cut on his hand and asked him if he needed medical attention. Fisher ignored their questions but demanded they get a search warrant. Officer Goolsby pushed the front door partway open and entered. Through the window of the open door, Goolsby saw Fisher pointing a long gun at him, so he withdrew. *Id.*

¶ 41    Fisher was charged with assault with a dangerous weapon and possession of a firearm during the commission of a felony. The trial court found Goolsby violated the fourth amendment when he entered the house and granted Fisher's motion to suppress Goolsby's statement that Fisher pointed a gun at him. The Michigan Court of Appeals affirmed the trial court's order. *Id.*

¶ 42    The United States Supreme Court granted *certiorari* and reversed in a *per curiam* opinion. *Id.* at 47. The Court found "[a] straightforward application of the emergency aid exception, as in *Brigham City*, dictates that the officer's entry was reasonable." *Id.* at 48. The Court continued:

> "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception. The only injury police could confirm in *Brigham City* was the bloody lip they saw the juvenile inflict upon the adult. Fisher argues that the officers here could not have been motivated by a perceived need to provide medical assistance, since they never summoned emergency medical personnel. This would have no bearing, of course, upon their need to ensure that Fisher was not endangering someone else in the house. Moreover, even if the failure to summon medical personnel conclusively established that Goolsby did not subjectively believe, when he entered the

house, that Fisher or someone else was seriously injured (which is doubtful), the test, as we have said, is not what Goolsby believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Id.* at 49 (quoting *Brigham City*, 547 U.S. at 406).

¶ 43   With *Brigham City* and *Fisher* in mind, a two-part test has developed over the years in Illinois to determine whether the emergency aid exception applies. For example, in *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 29, the First District stated the test as follows:

"First, the police must have 'reasonable grounds' to believe there is an emergency at hand; and second, the police must have some reasonable basis, 'approximating probable cause,' associating the emergency with the area to be searched or entered. [Citation.] The reasonableness of the officers' beliefs as to the existence of an emergency is determined by the totality of the circumstances known to the officer at the time of entry. [Citation.] The United States Supreme Court has held that emergency situations include instances when someone may be injured or threatened with injury."

¶ 44   In that case, Chicago police officers responded to multiple 911 calls from citizens that gunshots had been heard inside and outside a multiunit building. *Id.* ¶ 5. Upon arriving at a first-floor unit, the officers knocked and announced that they were police officers. *Id.* ¶ 6. A child answered, and Officer Thomas observed two adult women and three small children inside the apartment. *Id.* The five individuals were told to exit because of the serious nature of the call. *Id.* ¶ 7. Once they exited, Officer Thomas observed the defendant and told him to exit the apartment. Thomas did not see anyone in distress, injured, or in need of medical attention. Thomas and his partner entered the apartment to perform a visual safety check to ensure no one had been shot. *Id.* The officers searched the bedrooms, bathroom, and main room, and in one of the bedrooms, they found body armor, a pistol holster, and pistol ammunition. *Id.* ¶ 8. The officers took the defendant into custody, and a further search of the building's exterior revealed four spent shell casings. *Id.*

¶ 45   The circuit court granted the defendant's motion to suppress evidence, finding, in part, that the officers' entry was improper because they did not observe any evidence that an emergency was in progress or that anyone was in distress. *Id.* ¶ 10.

The State appealed, arguing the officers' actions were justified under the emergency aid exception. *Id.* ¶ 17.

¶ 46   The First District utilized the two-part test to determine whether the emergency aid exception applied. *Id.* ¶ 29. First, the court found the officers met the first prong of having reasonable grounds to believe an emergency existed. *Id.* ¶ 31. The court noted the officers had responded to multiple 911 calls and that " '[a] 911 call is one of the most common—and universally recognized—means through which the police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help.' " *Id.* (quoting *United States v. Richardson*, 208 F.3d 626, 630 (7th Cir. 2000)). Further, given the reports of gunshots being fired in an apartment building, "the probability that someone had been shot was sufficient to create a reasonable belief that an emergency existed." *Id.* ¶ 36.

¶ 47   As to the second prong focusing on probable cause, the First District noted "probable cause in an emergency situation is based upon a desire to locate potential victims and ensure their safety, rather than a reasonable belief that a search will disclose evidence of criminal activities." *Id.* ¶ 50 (citing *United States v. Holloway*, 290 F.3d 1331, 1337-38 (11th Cir. 2002)).

¶ 48   Considering the facts of the case before it, the First District found probable cause for the officers to search the apartment. *Id.* ¶ 53. The police had received multiple 911 calls of gunshots being fired, creating the reasonable belief that criminal activity had occurred in the apartment and someone inside could be seriously injured. *Id.* "Responding to the call, the police entered the apartment for the express purpose of performing a safety check to ensure that no one had been injured or was in need of medical assistance." *Id.*

¶ 49   Since *Lomax* was decided, our appellate court has continued to utilize the two-part test to determine the validity of a search under the emergency aid doctrine. *People v. Kulpin*, 2021 IL App (2d) 180696, ¶ 41; 2021 IL App (1st) 190692, ¶ 48; *People v. Ramsey*, 2017 IL App (1st) 160977, ¶ 24. We adopt this test, finding it consistent with the pronouncements on the emergency aid doctrine by the United States Supreme Court and with our own search-and-seizure jurisprudence. With this test in mind, we now apply it to the facts of this case.

¶ 50                          1. *Reasonable Grounds to Believe an Emergency Exists*

¶ 51         In the case *sub judice*, the police officers had reasonable grounds to believe an emergency existed. Officers responded to Ali's 911 call at approximately 4 a.m. in regard to a suspected battery in progress. Ali met them and said he had heard loud arguing and wrestling, followed by one individual saying, "Are you okay?" and "Get up." Ali testified he heard "yelling and screaming" from upstairs and then defendant mentioning the name "Talal, Talal" and "some panic." He said he relayed this to the police.

¶ 52         The officers proceeded upstairs to defendant's apartment. After knocking on the door, defendant answered, only opening the door about a foot. Defendant said everything was okay. When officers asked to speak with defendant's brother, defendant said the man was sleeping. After deciding to leave and returning downstairs, the officers conversed again with Ali, who was "adamant" about what had occurred and that someone was seriously hurt. The officers returned upstairs and knocked on defendant's door for approximately five minutes, but they received no response.

¶ 53         The officers returned to their squad car and "punched in a code" that everything was okay. However, Officer Lugo testified "[s]omething didn't feel right." He drove around the building to the alley. Upon exiting, Lugo saw the back gate open. After entering the yard, the officers observed the garage door open as well as the side entrance to the building. They entered the building and went to the upstairs apartment. Once there, they saw the door "wide open." They knocked and announced their office, but they received no response. They then entered the apartment and searched room to room, ultimately finding Talal unresponsive on the bed.

¶ 54         The first part of the two-part test focuses on the reasonableness of the officer's beliefs as to the existence of an emergency and requires an examination of the "totality of the circumstances known to the officer *at the time of entry*." (Emphasis added.) *Lomax*, 2012 IL App (1st) 103016, ¶ 29. Here, the totality of the circumstances justified the officers' entry into the apartment. Ali had called 911 to report a suspected battery in progress. See *People v. Carter*, 2021 IL 125954, ¶ 26 (noting "a caller's use of the 911 emergency system is *** [an] indicator of veracity"). The officers were then able to speak directly with Ali, who was adamant

about what he heard. The officers' initial investigation was inconclusive, so much so that, after further conversation with Ali, they returned upstairs, only to receive a lack of response from defendant. Then, the officers' further investigation revealed an open gate, an open garage door, an open door to the building, and an open door to defendant's apartment—all at four in the morning—with no response from inside the apartment. At that time, considering the totality of the circumstances, officers could have reasonably believed that an emergency existed, the perpetrator had fled, and someone may be inside and injured. See *Johnson v. City of Memphis*, 617 F.3d 864, 869-70 (6th Cir. 2010) (holding "that the combination of a 911 hang call, an unanswered return call, and an open door with no response from within the residence is sufficient to satisfy the exigency requirement" and "[t]he officers' actions—announcing their presence and, after receiving no answer, entering in order to perform a cursory search for any endangered or injured persons—was an objectively reasonable response").

¶ 55    Defendant argues the passage of time from the officers' arrival on the scene and their entry into the apartment, "[r]oughly" 15 to 20 minutes according to Officer Lugo, establishes that no emergency existed. However, the passage of time is but one fact to consider. Moreover, the Supreme Court has said "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (*per curiam*). Here, the elapsed time allowed the officers to investigate further and, with the accumulation of factual evidence, ultimately provided reasonable grounds to enter the apartment.

¶ 56    We reiterate that emergency situations include instances when someone is injured or threatened with injury (*Brigham City*, 547 U.S. at 403) and "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception" (*Fisher*, 558 U.S. at 49). While the facts in this case, taken individually, might not have established the presence of an injured person, the totality of the circumstances at the time of entry provided an objective, reasonable basis for believing someone was injured inside the apartment.

### 2. *Probable Cause*

The police officers also had a reasonable basis, akin to probable cause, associating the emergency with the area to be entered and searched. "[I]n an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Holloway*, 290 F.3d at 1338.

Here, the circumstances established reasonable grounds to believe an emergency existed in defendant's apartment. The events described by the downstairs neighbor, defendant's initial presence in the apartment, and the open gate and doors leading to the apartment all go toward establishing the police had a reasonable basis, approximating probable cause, to associate the emergency with the area to be entered and searched.

### D. Warrant After Discovery of the Body

Defendant argues that, assuming the officers' warrantless entry was supported by the emergency aid exception, once Talal's body was discovered, the exigency no longer existed and the officers should have obtained a warrant. We find defendant's argument forfeited. Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018) requires an appellant to adequately develop his argument with citation of relevant authority. Defendant has not done so here, offering only a single paragraph in his argument and citing one appellate court case that he concedes "did not take up the issue." Thus, the issue is forfeited. See *People v. Ward*, 215 Ill. 2d 317, 332 (2005) (stating a point raised in a brief but not supported by citation of relevant authority fails to satisfy Rule 341).

### E. The Community Caretaking Doctrine and the Emergency Aid Exception

We note the circuit court based its 2018 denial of the motion to suppress on the community caretaking doctrine. However, in 2021, the United States Supreme Court held a police officer's community caretaking duties do not create "a standalone doctrine that justifies warrantless searches and seizures in the home." *Caniglia v. Strom*, 593 U.S. ___, ___, 141 S. Ct. 1596, 1598 (2021). Given that we

have found the emergency aid doctrine applied in this case and since we can affirm on any basis in the record, notwithstanding the circuit court's reasoning, we need not address the community caretaking doctrine further.

¶ 64     Instead, as the Supreme Court has noted, "warrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement." *King*, 563 U.S. at 462. Here, given the totality of the circumstances, it was reasonable for the officers to enter the apartment, absent a warrant, to see if one of the occupants was in need of emergency aid. As such, the officers' entry and search were both reasonable, and the circuit court did not err in denying defendant's motion to suppress. See *People v. Ferral*, 397 Ill. App. 3d 697, 705 (2009) (stating, if the entry was valid under the emergency aid exception, "then evidence of crime discovered during the entry may be legally seized without a warrant").

¶ 65                              II. Sufficiency of the Evidence

¶ 66     "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 64. "Under this standard of review, it is the responsibility of the trier of fact to 'fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Howery*, 178 Ill. 2d 1, 38 (1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard applies whether the evidence is direct or circumstantial, and "circumstantial evidence that meets this standard is sufficient to sustain a criminal conviction." *Jackson*, 2020 IL 124112, ¶ 64.

¶ 67     In reviewing the evidence presented at the trial, we will not retry the defendant or substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. "All reasonable inferences are drawn in favor of a finding of guilt." *People v. Swenson*, 2020 IL 124688, ¶ 35. "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094,

- 16 -

¶ 67. This standard of review applies regardless of whether the defendant received a bench or jury trial. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 225 (2009).

¶ 68        Defendant argues the appellate court erred in finding the evidence was sufficient to prove him guilty of first degree murder beyond a reasonable doubt. Specifically, he focuses on the appellate court's misapprehension in its original opinion that his blood was located on the handle of the alleged murder weapon. The record reflects that there was no blood on the knife handle, and the appellate court entered a modified opinion correcting the misstatement. Defendant, however, argues the fact that his DNA, whether it be touch or trace DNA, was found on the knife handle proved nothing and, thus, when this is taken into consideration, the evidence of his guilt crumbles.

¶ 69        We find defendant's argument of little merit considering the totality of the State's evidence against him. As noted, along with defendant's DNA on the knife handle and Talal's blood on the knife blade, defendant's presence at the murder scene was confirmed by Ali and Officer Lugo. Ali testified he heard wrestling, yelling, and screaming, defendant saying, "Talal, Talal," and "some panic." Defendant admitted to Ali that he and Talal had argued. He told Ali that Talal was in the bathroom and later said Talal was talking with family. Defendant then told the police that Talal was sleeping. Knowing that police officers were in the vicinity, defendant fled from the crime scene. Two days later, he again fled upon seeing the police. When he was apprehended, defendant's underwear had bloodstains on it that contained Talal's DNA.

¶ 70        Taking the evidence in the light most favorable to the State, we find that a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

¶ 71                                    CONCLUSION

¶ 72        For the foregoing reasons, we affirm the judgment of the appellate court, which affirmed defendant's conviction and sentence for first degree murder.

¶ 73        Judgments affirmed.