2024 IL App (1st) 230050-U

No. 1-23-0050

Order filed December 13, 2024

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 3593 |
| | ) | |
| OMAR DIXON, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva and Justice Oden Johnson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The court did not abuse its discretion in admitting proof of other crimes and the State proved defendant guilty of first degree murder and armed robbery beyond a reasonable doubt.

¶ 2   Following a bench trial, defendant Omar Dixon was convicted of first degree murder and armed robbery and sentenced to consecutive terms of 54 and 31 years' imprisonment, respectively. On appeal, he argues that the court abused its discretion in allowing proof of other crimes and the State failed to prove his guilt beyond a reasonable doubt. For the following reasons, we affirm.

¶ 3    Defendant was charged with multiple counts of first degree murder and armed robbery for shooting and killing Terrance Harris and taking cannabis from Harris's person on January 14, 2015.

¶ 4    Before trial, the State filed a notice of intent to introduce other-crimes evidence involving the shooting of Corey Smiley. On January 8, 2015, Smiley had been shot at by two people, one of whom he identified as defendant. Several .40-caliber fired cartridge casings and two 9-millimeter fired cartridges were recovered from the scene of Smiley's shooting, and one .40-caliber fired cartridge was recovered from the scene of Harris's shooting. Forensic testing indicated all the .40-caliber casings were fired from the same weapon. Defense counsel objected, arguing that no evidence showed that defendant had fired the .40-caliber weapon at Smiley, the shootings were dissimilar where only one person shot Harris, and the evidence would be more prejudicial than probative. The court ruled the State could introduce the other-crimes evidence to establish defendant's identity as Harris's shooter.

¶ 5    At trial, Farad Murphy testified that, in 2017, he pled guilty to a misdemeanor firearm offense that had been charged as a felony and reduced as part of his plea and not in exchange for his testimony in this case.

¶ 6    On January 14, 2015, Murphy lived on the 8100 block of South Artesian Avenue, in Chicago. That afternoon, defendant, whom Murphy had known for five years, phoned Murphy requesting to purchase marijuana. Murphy had none, so he called Mackenzie McDowell. Murphy arranged for he and defendant to meet McDowell between houses at 8130 Artesian for defendant to purchase marijuana from McDowell.

¶ 7    Around 5:15 p.m., Murphy met defendant at Artesian and 80th Street and walked with him to the gangway at 8130 Artesian. Defendant wore all black and his hair was in "[s]hort twists." Murphy contacted McDowell to bring the marijuana.

¶ 8    Harris, whom Murphy had not met before but had seen and believed to be related to McDowell, entered the front of the gangway. Harris faced Murphy and defendant, who were standing side by side. Harris handed a bag of marijuana to defendant, who drew a firearm, pointed it at Harris, and said, "this is mine." Harris lunged towards defendant, and Murphy saw a flash and heard a "bang." Murphy ran out of the gangway towards Artesian and turned left.

¶ 9    The State published surveillance footage from a camera at a neighbor's house on Artesian. Murphy testified that, at the time, he had dreadlocks that went past his shoulders. The video is included in the record on appeal and has been reviewed by this court. When the timestamp shows 5:18, it depicts a man whom Murphy identified as Harris approaching a house, then walking backward the way he had come, turning, and walking on a sidewalk until he is off screen. About 30 seconds later, a person with long hair, whom Murphy identified as himself, runs from that direction. Murphy testified he ran after Harris had been shot.

¶ 10    Murphy further testified that, after leaving the gangway, he went to the home of his friend Hakeem Abdullah, who knew defendant. Murphy told Abdullah about the shooting. Murphy twice testified during trial that he told Abdullah that defendant was the shooter but also testified during trial that he did not remember if he named the shooter.

¶ 11    Murphy left Abdullah's and received a phone call from defendant, who apologized and asked Murphy to pretend he did not know what happened and lie to police about defendant's presence. Murphy's brother drove Murphy to the police station. While they were on the way,

defendant called Murphy a few more times. Murphy did not answer and threw his phone in the street out of fear. At the police station, Murphy identified defendant in a photo array. On February 4, 2015, he returned and gave a statement indicating that he told Abdullah that defendant "used" him and robbed and killed someone.

¶ 12     Murphy, who was 29 years old during the 2022 trial, initially testified he had known McDowell for 5 to 7 years before the shooting and purchased marijuana from him three to five times. However, he had testified to the grand jury in 2015 that he had known McDowell for one or two years and had purchased marijuana from him 5 to 10 times, and later testified during trial he had known McDowell since seventh grade. Murphy had several phone conversations with McDowell before the transaction with defendant but did not remember McDowell calling him at 5:17 and 5:18 p.m. the day of the shooting.

¶ 13     McDowell testified that Harris was his cousin. On January 14, 2015, he picked up Harris and Harris's approximately three-year-old son, and the trio planned to attend a basketball game. Harris said he needed to meet someone to sell marijuana and directed McDowell to 82nd Street and Artesian. At some point, Harris received a phone call from Murphy.

¶ 14     When McDowell and Harris arrived at 82nd and Artesian, Harris exited McDowell's vehicle. He approached a house, stopped, giggled, and said, "damn, I'm at the wrong house." He walked one or two houses over and entered a gangway. McDowell did not recall telling Harris that he was approaching the wrong house. Defense counsel asked if it was a "fact" that McDowell knew Harris was approaching the wrong house because McDowell had arranged the transaction on his "burner phone," and McDowell testified that was false.

¶ 15    McDowell saw Harris walking in the gangway "next to [Murphy]." There was another person in the gangway. McDowell could not see that person's face or clothing, but "[k]ind of" saw the person's hair, which was short. Murphy and Harris stood next to each other and the other person was in front of them. Harris raised his hand as if to protect himself or fight. McDowell saw a flash, heard a "pop," and saw Harris fall.

¶ 16    After the shot, Murphy ran out the front of the gangway and turned to his left. The other person disappeared towards the back of the gangway. McDowell drove around the block and through the alley between Artesian and Campbell Avenue, trying to catch the person. He saw someone in black at the end of the alley on 81st Street. The person did not look like Murphy. He could not tell the length of the person's hair. McDowell drove to the end of the alley and lost sight of the person, who ran behind a garage.

¶ 17    McDowell returned to Artesian, exited his vehicle, and approached Harris. He did not call 911 as his phone was in his vehicle. He denied placing the phone with which he had communicated with Murphy inside Harris's pocket. A girl came outside and he asked her to call 911. The police arrived but he did not speak to them and they asked him to leave for being "unruly." As McDowell left, he saw somebody between two houses on Campbell near 81st. The person, whom McDowell identified in court as defendant, yelled "it wasn't me," and ran.

¶ 18    When McDowell arrived at his home, his grandmother was there with a detective. He did not speak with the detective. However, he was interviewed by detectives at the police station later that night, and again a few days later. On January 16, 2015, he identified defendant in a photo array as the person he saw on Campbell. He did not tell detectives that Murphy, whom he had known since 2005, was present during the shooting or involved in the marijuana deal as he had

seen Murphy at the police station and thought they already knew. He denied arranging the marijuana transaction with Murphy or ever selling marijuana to Murphy. He denied that Murphy called him on his "burner phone" that day or that he called Murphy at 5:17 and 5:18 p.m. the day of the shooting from his burner phone.

¶ 19     McDowell did not recall testifying to the grand jury that (1) when Harris exited his vehicle, he told Harris that Harris was approaching the wrong house; (2) he did not know who the three people in the gangway were; or (3) the person he saw in the alley after the shooting had "long dreads." He did not recall whether, in his grand jury testimony, he mentioned Murphy's name or referred to him "as the guy with the long dreads."

¶ 20     Chicago police detective Thomas Carr testified that he responded to the scene of Harris's shooting and saw Harris's body in the gangway. He observed a .40-caliber cartridge nearby, and recovered an iPhone and a flip phone from Harris's coveralls. The flip phone showed a call from Murphy that was "recent to the time of the incident" and "several calls prior to the shooting." Carr viewed the neighbor's security footage, and spoke with Murphy, who identified defendant in a photo array as Harris's shooter. On January 15, 2015, he obtained a pen register for defendant's phone number and issued an investigative alert for defendant.

¶ 21     On January 16, 2015, McDowell identified defendant in a photo array as the person he saw on Campbell, and Murphy as the person "that he knew [Harris] to sell weed to on Artesian." Carr also learned that defendant's phone traveled to Bloomington, Illinois. On January 24, 2015, he obtained an arrest warrant for defendant, who was arrested that day in Wisconsin.

¶ 22     The State entered several stipulations, including that an officer recovered a Winchester .40-caliber cartridge case a few feet from Harris's body and a medical examiner determined that Harris

died by homicide from a single gunshot wound that entered his neck and penetrated his chest and right arm. The examiner recovered a medium-caliber projectile from his arm. An FBI special agent created a historical cell-site analysis for a cell phone registered to defendant. The analysis was entered into evidence and is included in the record on appeal. It shows the cell phone utilized cell sites near the shooting between 4:45 p.m. on January 14, 2015, and 9:44 a.m. on January 15, 2015, and traveled to Bloomington on January 15, 2015. Cell phone records for that phone number were entered into evidence and show that defendant called a number registered to Murphy more than 50 times between 5:26 p.m. and 11:43 p.m. on January 14, 2015.

¶ 23   The parties further stipulated that, on January 24, 2015, sheriff's officers in Wisconsin learned that defendant was in a hotel room in Blooming Grove, Wisconsin. They telephoned him and asked him to exit the room. He opened the door, looked towards the officers, and shut the door. Officers heard "rummaging" inside the room. Defendant looked through the shades of the back window and closed them. Approximately five minutes later, he opened the door and was arrested. A cell phone was recovered from the toilet.

¶ 24   Smiley testified about the other-crimes evidence. Around 5 p.m. on January 8, 2015, he drove two friends to a barbershop on the 8200 block of South Kedzie Avenue. When he pulled in front of the barbershop, an SUV stopped next to his driver's side door. He heard a gunshot and saw that people in the SUV were shooting. He could not see their faces. He did not recognize the front passenger in the SUV as someone he knew from his neighborhood or see that person extending a handgun from the SUV. He heard about 20 shots and was shot once in the back.

¶ 25   Smiley denied or did not remember telling a detective on January 12, 2015, that he believed the first name of one of his shooters was Omar; identifying someone in a photo array on January

20, 2015; identifying one of the shooters in a lineup on March 4, 2015; also on March 4, 2015, signing each page of a typed statement indicating he had identified one of the shooters in the lineup; or testifying before the grand jury on March 26, 2015, including identifying a photograph of the person who shot him from the front passenger seat of the SUV. He recalled officers told him that evidence from his shooting matched evidence from another crime and showed him pictures of "someone" they said had shot him.

¶ 26    Police officers and assistant state's attorneys (ASAs) testified that Smiley identified defendant, whom he recognized from the neighborhood, in a photo array and lineup as the shooter from the SUV's front seat, and signed a typed statement confirming that he identified the shooter in the photo array and lineup. They identified the photo array and its advisory form, and photos of the lineup and its advisory form. On March 26, 2015, Smiley testified before the grand jury that he had identified the shooter in a photo array and lineup and confirmed the identifications in a statement typed by an ASA. The State entered into evidence the photo array and lineup exhibits, the typed statement, and a transcript of Smiley's grand jury testimony. A detective testified that, in October 2021 and January 2022, Smiley reiterated the truth of the typed statement and that defendant had shot him, and that Smiley was shot approximately one mile from where Harris was shot.

¶ 27    The State entered stipulations that forensic evidence from the Smiley shooting included three Winchester .40-caliber fired cartridge cases, two PMC .40-caliber fired cartridge cases, and two 9-millimeter fired cartridge cases. Smiley also gave an officer a bullet. Testing showed that the fired cartridge case from the scene of Harris's shooting, the fired bullet recovered from Harris's body, the .40-caliber casings recovered from the scene of Smiley's shooting, and the bullet Smiley

gave an officer were fired from the same weapon, a .40-caliber handgun which an officer had recovered in 2018.

¶ 28    The defense entered several stipulations. A phone recovered from Harris's body placed calls to Murphy at 5:17 p.m. and 5:18 p.m. on January 14, 2015. Hakeem Abdullah would testify that when Murphy came to his home that day he did not mention defendant's name. During McDowell's interview with detectives on January 14, 2015, he (1) referred to Murphy as the man "with dreads" rather than by his name, (2) did not state that he recognized the third person in the gangway with Harris and Murphy, and (3) stated that the person who later told McDowell "it wasn't me" had "the same physical features as the person standing in front of Terrance Harris when [McDowell] saw the flash and heard the shots." During McDowell's grand jury testimony, he testified that (1) Harris initially approached the wrong house and McDowell rolled down his window and told him it "wasn't the address he said"; (2) McDowell had a clear view from his vehicle into the gangway and saw the other people in the gangway with Harris but did not know their identities; and (3) when McDowell entered the alley after the shooting he saw "the man with the long dreads."

¶ 29    During closing arguments, defense counsel asserted that the State failed to prove defendant shot and robbed Harris due to inconsistencies and contradictions in Murphy and McDowell's testimonies. In response, regarding the inconsistencies in McDowell's testimony about whether he helped arrange the marijuana transaction, the State argued that "it's not unusual for an individual to not want to admit to police and not want to admit to a court that he set up a drug deal, one that ultimately ended in the homicide of his best friend, his cousin." The court found defendant guilty on all counts.

¶ 30    Defendant filed a motion for judgment notwithstanding the verdict or for a new trial. The motion did not challenge the court's admission of the other-crimes evidence of Smiley's shooting. The court denied the motion.

¶ 31    Following a sentencing hearing, the court merged the counts into one count of murder and one count of armed robbery and sentenced defendant to respective, consecutive terms of 54 and 31 years' imprisonment. The court denied defendant's motion to reconsider sentence.

¶ 32    On appeal, defendant first argues the court erred in admitting the other-crimes evidence that he shot Smiley.

¶ 33    Initially, we note that defendant has forfeited this issue by failing to raise it in his posttrial motion. *People v. Phillips*, 2022 IL App (1st) 181733, ¶ 156 (to preserve issue, defendant must generally make contemporaneous objection and raise issue in written posttrial motion). However, he requests we review the issue for plain error and argues that his trial counsel provided ineffective assistance for failing to preserve the issue.

¶ 34    The plain error doctrine allows us to review a forfeited claim where a clear or obvious error occurred, and the evidence is closely balanced or the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Pacheco*, 2023 IL 127535, ¶ 55. The first step is determining whether a clear and obvious error occurred. *Id.* Without such error, there is no plain error. *Id.* ¶ 61. Likewise, where there is no error, counsel is not deficient for failing to preserve the issue. *People v. Bannister*, 232 Ill. 2d 52, 79-80 (2008). We find there was no error here.

¶ 35    Other-crimes evidence is generally inadmissible to show the defendant's propensity to commit a crime, but may be admitted to prove his identity or for any other relevant purpose. *People*

*v. Moore*, 2023 IL App (1st) 211421, ¶ 93; see also Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). Evidence is relevant and admissible if it tends to make the existence of a consequential fact more or less probable. *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 96; see also Ill. R. Evid. 401 (eff. Jan. 1, 2011). The State need not prove the defendant's involvement in the other crime beyond a reasonable doubt, but must prove it by "more than a mere suspicion." (Internal quotation marks omitted.) *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 142.

¶ 36    We review the admission of evidence for an abuse of discretion. *Moore*, 2023 IL App (1st) 211421, ¶ 92. A court abuses its discretion when its decision is arbitrary or fanciful, or no reasonable person would take the court's view. *Id.*

¶ 37    Here, the court admitted evidence of Smiley's shooting to prove defendant's identity as Harris's shooter. Defendant argues the evidence was inadmissible as it was irrelevant given the lack of evidence that he fired the .40-caliber firearm at Smiley, and as it was too dissimilar to the Harris shooting. He further argues that the evidence's prejudicial value was exacerbated by the court's failure to limit the amount of the other-crimes evidence.

¶ 38    In the instant case, the court's decision to admit evidence that defendant shot Smiley was reasonable. On January 8, 2015, on the 8200 block of Kedzie, two people shot at Smiley. He identified one of the shooters as defendant. Police recovered .40-caliber cartridges and a fired bullet while investigating the shooting. Murphy testified that, on January 14, 2015, on the 8100 block of Artesian, defendant shot and killed Harris. A. 40-caliber cartridge was found at the scene and a fired bullet was recovered from Harris's body. The cartridge casings and bullets from both shootings were determined to have been fired by the same weapon. Thus, the two shootings

occurred six days apart about one mile from each other. Defendant was identified as Harris's shooter, and the firearm used to shoot Harris was one of the two firearms fired at Smiley.

¶ 39 The other-crimes evidence was relevant to proving defendant's identity as Harris's shooter even without direct evidence that he, and not Smiley's other shooter, fired the .40-caliber weapon at Smiley. In *People v. Coleman*, 158 Ill. 2d 319, 329 (1994), police linked the defendant, charged with murder, to a firearm that was used to kill someone else in an other-crimes offense. The bullet that killed the victim in the charged offense was too damaged to determine whether it had been fired from that weapon. *Id.* at 329-30. However, the bullet shared many characteristics with the bullet from the other-crimes offense. *Id.* Our supreme court found that the defendant's participation in the other-crimes shooting was relevant and admissible as it involved the same type of weapon as the charged offense and showed the defendant had access to that type of weapon. *Id.* at 335.

¶ 40 The same is true here. Evidence that defendant shot at Smiley and that one of Smiley's shooters used the same weapon that was used to kill Harris six days later was relevant to link defendant to the firearm that was used to kill Harris and established defendant's potential access to that firearm. The other-crimes evidence therefore made it more likely that Murphy truthfully identified defendant as Harris's shooter. See *Cerda*, 2021 IL App (1st) 171433, ¶ 96 (evidence is relevant and admissible if it tends to make existence of any consequential fact more probable).

¶ 41 Further, while there were dissimilarities between Smiley's and Harris's shootings, general similarities suffice when, as here, evidence is not offered to prove *modus operandi* or common design. *Simmons*, 2016 IL App (1st) 131300, ¶ 153. The other-crimes evidence was relevant to proving defendant's identity as the shooter. To this end, the general similarities between the shootings were sufficient to make the other crimes evidence admissible. Namely, Smiley and

Harris were shot at by the same firearm, six days apart, approximately one mile from one another, and defendant was identified as a shooter in both events. Contrary to defendant's contention, geographic proximity has been considered a similarity. See *People v. Taylor*, 101 Ill. 2d 508, 521 (1984) (finding "substantial similarities" between shootings that occurred "within a one-block area and within a four-day period"); *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 90 (geographic proximity to charged offense added to probative value of other-crimes offense).

¶ 42    Last, defendant notes the other-crimes evidence was comprised of 6 witnesses, 1 stipulation, and 26 exhibits, including 10 crime-scene photographs, 7 cartridge cases, and 1 fired bullet. See *Cerda*, 2021 IL App (1st) 171433, ¶ 122 (trial court should prevent "other-crimes evidence creating a minitrial on the other offense"). He argues the amount of evidence made it more likely that he was convicted due to his perceived bad character than due to the State's proving that he committed the charged offenses. We disagree that the amount of evidence the State presented regarding the Smiley shooting resulted in its prejudicial effect substantially outweighing its probative value.

¶ 43    The now complained-of witnesses include police officers and ASAs, whose testimonies were necessary to establish Smiley's identification of defendant given Smiley's recantation at trial. See 725 ILCS 5/115-10.1 (West 2022). The additional evidence regarding the recovery and testing of the casings, bullet, and firearm was necessary to establish that the same firearm was used in both shootings.

¶ 44    While the crime scene photographs and casings and bullet from the Smiley shooting were not as probative as the above evidence, their introduction did not result in prejudice or increase the likelihood that the other-crimes evidence would be improperly considered as propensity evidence.

This is especially so where defendant received a bench trial, and the record does not indicate that the court considered the other-crimes evidence as propensity evidence. See *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24 (reviewing court presumes trial court considered other-crimes evidence only for proper purpose).

¶ 45 In sum, the court did not abuse its discretion in admitting the State's evidence of the Smiley shooting. As the court did not err, there was no plain error and trial counsel was not deficient for failing to preserve the issue. *Pacheco*, 2023 IL 127535, ¶ 61; *Bannister*, 232 Ill. 2d at 79-80.

¶ 46 Next, defendant argues that the State failed to prove his guilt beyond a reasonable doubt. When a defendant challenges the sufficiency of the evidence, the question is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Aljohani*, 2022 IL 127037, ¶ 66. We do not retry the defendant and must draw all reasonable inferences in favor of guilt. *Id.* ¶ 67.

¶ 47 The factfinder is responsible for resolving conflicts in testimony, weighing the evidence and, in particular, determining witness credibility. *People v. Woodson*, 2023 IL App (1st) 191353, ¶ 67. We will not substitute our judgment for the factfinder's on questions involving witness credibility or the weight of the evidence. *People v. Jones*, 2023 IL 127810, ¶ 28. That said, a factfinder's credibility determination is not conclusive or binding (*People v. Wynder*, 2024 IL App (1st) 221875, ¶ 36) and we may find after considering the whole record that flaws in a witness's testimony make it impossible to reasonably accept any part of it (*People v. Herman*, 407 Ill. App. 3d 688, 704 (2011)). We will reverse a conviction where the evidence is so unreasonable,

improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Aljohani*, 2022 IL 127037, ¶ 67.

¶ 48    Defendant was convicted of first degree murder and armed robbery. Relevant here, a person commits first degree murder if he performs an act which causes the death of another and intended to kill or do great bodily harm or knew the act would kill that person. 720 ILCS 5/9-1(a)(1) (West 2014). A person commits armed robbery where he knowingly takes property from another by force or threat and personally discharges a firearm that proximately causes great bodily harm, permanent disability or disfigurement, or death. 720 ILCS 5/18-1(a), 18-2(a)(4) (West 2014). Defendant challenges only whether the State proved his identity as the offender.

¶ 49    We find the evidence sufficient to sustain defendant's convictions. Murphy testified that defendant, whom Murphy had known for five years, took marijuana from Harris and shot him. The positive and credible testimony of a single witness may sustain a conviction, and physical evidence is unnecessary. *People v. Hill*, 2023 IL App (1st) 150396, ¶ 23; see also *Woodson*, 2023 IL App (1st) 191353, ¶ 70 (single witness's identification of accused may sustain a conviction).

¶ 50    Moreover, Murphy testified that, after the shooting, defendant called him, apologized, and asked him to lie about defendant's presence at the scene. The cell phone records show he called Murphy more than 50 times after the shooting. McDowell testified that the third person in the gangway besides Murphy and Harris disappeared towards the back of the gangway. After the shooting, McDowell encountered defendant between two houses near Campbell and 81st, and defendant said, "it wasn't me." Murphy and McDowell went to the police station and identified defendant in photo arrays. Defendant's cell phone was tracked to Bloomington, and officers located him in Wisconsin and found his cell phone in the toilet of his hotel room. *People v. Davis*,

2023 IL App (1st) 220231, ¶ 42 (flight indicates consciousness of guilt); *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 35 (attempting to destroy evidence indicates consciousness of guilt). As discussed, defendant had also been linked to the firearm used to kill Harris through Smiley's identification of defendant as one of Smiley's shooters six days prior.

¶ 51   Defendant argues that Murphy and McDowell's testimonies were incredible. He claims their involvement in arranging the marijuana transaction provided motive to implicate defendant, especially for Murphy, who was the only other person in the gangway with defendant and Harris. He argues we should therefore carefully scrutinize their testimony as accomplices. See *People v. Fane*, 2021 IL 126715, ¶ 35 (accomplice testimony should be received with caution and carefully scrutinized as those who have participated in crime at issue have strong motive to deceive). He notes the prosecutor admitted in closing argument that McDowell had likely been untruthful about his involvement. See *People v. Schott*, 145 Ill. 2d 188, 206-07 (1991) (witness's testimony was incredible where it was impeached and inconsistent and she admitted to often lying).

¶ 52   Defendant posits several additional reasons for why Murphy and McDowell's testimonies were incredible. For one, neither Murphy nor McDowell identified defendant immediately after the shooting, as McDowell did not tell the police at the scene he recognized the person in the gangway and Murphy did not tell Abdullah that defendant was the shooter. In addition, McDowell's testimony about what he could see in the gangway was impeached as he did not tell police or the grand jury that Murphy was in the gangway. Murphy also testified inconsistently about how long he had known McDowell. Furthermore, McDowell described to the grand jury the man whom he chased in an alley after the shooting as having long dreadlocks, and Murphy had long dreadlocks and defendant had shorter hair. Additionally, Murphy testified he stood next to

defendant and Harris lunged at defendant, while McDowell testified Murphy stood next to Harris and Harris raised his hand. Lastly, McDowell called Murphy twice immediately after the shooting using a phone found on Harris's body, but denied doing so at trial.

¶ 53    However, we are not to substitute our judgment for the factfinder's on issues of witness credibility. *Jones*, 2023 IL 127810, ¶ 28. Further, while McDowell's testimony that he had no role in arranging the marijuana transaction is belied by Murphy's testimony, incredible parts of a witness's testimony do not necessarily render the whole testimony unbelievable. *People v. Gray*, 2017 IL 120958, ¶ 47; see also *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 (factfinder may accept or reject as much or little of a witness's testimony as it pleases, and inconsistencies between witnesses' testimonies do not render each witness unbelievable). It is not unreasonable to believe that McDowell diminished his role in the events leading to the murder of his cousin without lying about defendant's involvement. As to the 5:17 and 5:18 p.m. phone calls to Murphy from a phone on Harris's body, those may have occurred before the shooting, as the timestamp on the surveillance video depicts Harris approaching the scene of the shooting at 5:18 p.m., and we must draw reasonable inferences in favor of guilt. *Aljohani*, 2022 IL 127037, ¶ 67.

¶ 54    As to McDowell testifying to the grand jury that the person he saw in the alley had long dreadlocks, he testified at trial that the person he chased exited the back of the gangway, while Murphy ran out the front. McDowell also identified defendant as the person he saw on Campbell who said "it wasn't me." The trial court heard that evidence and could reasonably weigh it and determine that McDowell's trial testimony about defendant's involvement was credible. *Woodson*, 2023 IL App (1st) 191353, ¶ 67 (it is factfinder's duty to determine witness credibility and resolve evidentiary conflicts). Further, Murphy, not McDowell, provided the key testimony of the case,

namely, that defendant took Harris's marijuana and shot him. *Hill*, 2023 IL App (1st) 150396, ¶ 23 (testimony of single witness may sustain conviction).

¶ 55 Last, while Murphy may not have told Abdullah who the shooter was, after leaving Abdullah's, Murphy went to the police station and identified defendant. Murphy testified that the reduction of his 2017 firearm charge from a felony to a misdemeanor was not in exchange for his testimony. McDowell also went to the police station the night of the shooting and a few days later, and identified defendant. Defendant, on the other hand, left Chicago for Bloomington and then Wisconsin, where he did not surrender to police officers until after putting his cell phone in the toilet, indicating consciousness of guilt. *Davis*, 2023 IL App (1st) 220231, ¶ 42; *Sanchez*, 2013 IL App (2d) 120445, ¶ 35.

¶ 56 We conclude a rational trier of fact could therefore find the State proved defendant guilty beyond a reasonable doubt. Stated differently, the evidence presented was not so unreasonable, improbable, or unsatisfactory that it raises a reasonable doubt of defendant's guilt.

¶ 57 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 58 Affirmed.