2023 IL App (1st) 220087-U

No. 1-22-0087

Order filed May 12, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 4689 |
| | ) | |
| JAMES WILLIS, | ) | Honorable |
| | ) | Michael J. Kane, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court.
Justices Mitchell and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for unlawful use of a weapon by a felon because a rational trier of fact could find that he knowingly possessed the firearm.

¶ 2                                  BACKGROUND

¶ 3    After a bench trial, defendant James Willis was found guilty of two counts of unlawful use

of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2016)) premised on his possession

of a firearm (Count I) and ammunition (Count II), and one count of possession of a firearm without

a Firearm Owner's Identification (FOID) card (430 ILCS 65/2(a)(1) (West 2016)) (Count III). The court merged Counts II and III into count I, and sentenced defendant to two years in prison on that count. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he knowingly possessed a firearm.[1] We affirm.

¶ 4                                              FACTS

¶ 5      At trial, Chicago police detective Stephen Born testified that on February 23, 2017, he and Officer Bradley Scaduto surveilled the area near a residential building on the 200 block of East 136th Street in Chicago.[2] Born observed defendant leave the building and enter a vehicle. The officers stopped defendant for a traffic violation. During the stop, he stated that he resided at the building.

¶ 6      The next day, February 24, 2017, Born and other officers executed a search warrant for the first-floor apartment at the building. They knocked on the front door and announced their office. When no one answered, they forced entry into the apartment. The front door led to a living room and dining area, with access to a bedroom, bathroom, and another room apparently used for storage.

---

[1] Defendant also argues that the State failed to prove beyond a reasonable doubt that he knowingly possessed ammunition. However, defendant was not sentenced on the UUWF count premised on his possession of ammunition, only on the UUWF count premised on his possession of a firearm. This court's jurisdiction extends only to final judgments (Ill. Const. 1970, art. VI, § 6), and there is no final judgment in a criminal case until a sentence has been imposed (*People v. Flores*, 128 Ill. 2d 66, 95 (1989)). Thus, as sentence was not imposed on the UUWF count premised on defendant's possession of ammunition, we lack jurisdiction to consider the validity of this unsentenced conviction. *People v. Relerford*, 2017 IL 121094, ¶ 75.

[2] Born testified that he was not a detective in February 2017, but, rather, served on a tactical team. His first name is spelled "Steven" throughout the report of proceedings, but also appears as "Stephen" in the common law record.

¶ 7     In the bedroom, Born observed men's clothing. In a dresser in the bedroom, Born found a cardboard box containing a loaded chrome handgun and an additional magazine with live cartridges.

¶ 8     From a different drawer in that dresser, Born found documents comprising undated petitions and proposed orders to expunge, impound, and seal defendant's criminal records bearing defendant's signature; defendant's salary earnings statement for the pay period ending on January 31, 2017, listing an address on the 11300 block of South Carpenter; and defendant's criminal history reports from the Illinois State Police, dated December 29, 2016, and from the Chicago Police Department, dated January 4, 2017. Entries for defendant's arrests between December 2000 and October 2015 on the reports list his address as the South Carpenter address.

¶ 9     From a drawer in a different dresser in the bedroom, Born recovered a People's Gas bill, dated February 10, 2017, addressed to defendant at the apartment. From a cabinet in the living room, Born recovered a second letter from People's Gas dated January 5, 2017, and a letter from Comcast dated January 8, 2017, both addressed to defendant at the apartment. The letters state that defendant applied for or inquired about services from the companies and describe the next steps in the application processes. The documents recovered during the search were entered into evidence and included in the record on appeal.

¶ 10    During the search, an officer outside of the building observed defendant in a vehicle, stopped the vehicle, and brought him to the apartment. The officers later placed him in custody.

¶ 11    On cross-examination, Born did not recall the nature of defendant's traffic violation on February 23, 2017, or whether he ticketed defendant. Born also could not recall whether he asked for defendant's license, state identification, or insurance, or if defendant provided state

identification. Defendant told Born that he resided at the building during "[g]eneral conversation during the stop." Neither the traffic stop nor defendant's statement that he resided at the building were documented in the arrest report or original case incident report.

¶ 12    On the date of the search, Born did not observe defendant being detained or brought to the apartment. Officers detained another individual, Ashley Caldwell, with defendant. Born did not recall whether he spoke with Caldwell regarding whether she lived in the apartment.

¶ 13    Born recovered the firearm from a closed box with pink and purple decorative printing. The defense published two photographs of the bedroom, which were entered into evidence and included in the record on appeal. One photograph depicts purses and women's undergarments in drawers resting on a bed. The other shows two garments folded in a drawer. Born stated that the latter photograph, People's Exhibit No. 4, depicts the items he earlier described as men's clothing, and identified them as a t-shirt and sweatpants. Born agreed, however, that based on the photograph, he could not "say for certain" whether the clothing was for a man or woman. Multiple pairs of jeans were recovered from the dining room, and Born could not recall if they had tags. He was unsure if men's toiletries were recovered, or whether he recovered a key to the building from defendant.

¶ 14    During questioning by the court, Born stated that he did not find a lease for the apartment. It did not appear that anyone slept in the other rooms, and no other items were found in the drawer that contained the box with the firearm and ammunition.

¶ 15    Scaduto testified that he participated in executing the search warrant. Defendant was transported to the police station, administered warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), and agreed to answer questions. Scaduto and FBI special agent Tony Grubisic

questioned defendant, and the interview was recorded. The State published the audio recording without objection. Scaduto testified that he recognized his, Grubisic's, and defendant's voices in the recording.

¶ 16     The recording depicts the officers giving defendant the *Miranda* warnings. Defendant asks about the charges, and either Scaduto or Grubisic responds that he is charged in connection with a firearm and possession of marijuana. Defendant indicates that he was unsure what was recovered from the apartment, but states, "I'll take it, she don't have to take nothing, I'll take whatever was in there. She's good, know what I'm saying." Defendant explains that he and Caldwell have been dating for approximately two years, and the apartment belongs to Caldwell, who moved in approximately a month before defendant's arrest. Defendant states he does not know whose name is on the lease.

¶ 17     Defendant initially maintains that he does not possess keys to the apartment or store belongings there, but then clarifies that he probably had clothing at the apartment, though he had no clothes in the bedroom where officers recovered the firearm. The sweatpants belonged to Caldwell. Defendant only sleeps in the bed or stays at the apartment "every now and then," but he did stay there the night prior to his arrest. He states that a utility bill for the apartment is in his name because Caldwell could not obtain the service. Defendant further states that his permanent address is the South Carpenter address, where he resides with his mother. His wife and children reside near 79th and Racine.

¶ 18     Defendant then reiterates that he did not reside at the apartment and was unsure who visits Caldwell there, though he admits she could have other men in the apartment on occasions when she tells him not to come over. Regarding firearms, defendant states that ne never saw a firearm in

the apartment "unless it was on somebody." He previously had a FOID card, but could not register a firearm he previously possessed within the city limits at the time. He was attempting to "get his record squared way" to obtain a concealed carry license. Finally, defendant states that the money the police recovered from him was Caldwell's "tax money," which he was holding because she "can't hold onto it," and someone recently stole her purse.

¶ 19    On cross-examination, Scaduto stated that he did not advise defendant that the officers were recording the questioning. When questioned by the court, Scaduto stated the apartment was empty when the officers executed the search warrant. On recross examination, Scaduto could not recall if he asked for or saw defendant's driver's license or state identification.[3] Scaduto also could not recall if the recovered jeans had tags.

¶ 20    The State entered a certified copy of defendant's felony conviction for possession of a controlled substance into evidence. The State rested, and defendant moved for a directed finding, which the court denied.

¶ 21    Defendant testified that Caldwell moved into the apartment a month or two before his arrest on February 24, 2017. Because she had poor credit and owed money to People's Gas, she could not obtain service, and defendant "did it for her." Caldwell paid the gas bill, though it was in defendant's name. He did not possess a key to the apartment. The South Carpenter address was listed on his state identification, which he obtained in 2014.

¶ 22    On cross-examination, defendant reiterated that his wife and children resided near 79th and Racine, but he did not reside there. The day before his arrest, police officers stopped him

---

[3] It is unclear whether this testimony refers to the traffic stop the day before defendant's arrest, when defendant was brought to the apartment by an officer on the date of his arrest, or after defendant's arrest.

approximately one block from the 136th Street building. They asked for his driver's license, which he did not have, but he informed the officers that he resided at the South Carpenter address. Defendant denied stating to the officers during the stop that he lived at the 136th Street building.

¶ 23   Defendant further testified that he slept on the couch at the apartment the night before his arrest. Defendant and Caldwell's brother had jeans at the apartment they purchased the day before. Defendant knew he had to seal his criminal record to obtain another FOID card. He and Caldwell were completing the paperwork together, and she was also helping him expunge his case. Pursuant to this process, defendant obtained his criminal history record from the Chicago Police Department and took it to the apartment. He acknowledged that his paycheck, which was mailed to the South Carpenter address, could have only been at the apartment if he took it there.

¶ 24   Defendant stated that People's Exhibit No. 4 did not depict men's clothing, but rather jogging pants and a t-shirt that belonged to Caldwell. Defendant did not keep clothes in the apartment, except the two new pairs of pants. His name was not on the lease, and he did not pay any bills. The approximately $1400 recovered from him belonged to Caldwell. He was driving Caldwell's vehicle the day before his arrest. Under questioning by Scaduto and Grubisic, he offered to take responsibility for the firearm because he did not want Caldwell to go to jail.

¶ 25   On redirect examination, defendant stated that he had a romantic relationship with Caldwell. To his knowledge, she had romantic relationships with other men who stayed at the apartment on days when she told him not to visit. When questioned by the court, defendant stated the $1400 was tax money Caldwell had received. Caldwell worked full-time as a home health care worker, but defendant was unsure for how long. Defendant claimed responsibility for the firearm

because Caldwell was a good friend and he "didn't want to ruin her life just because she [was] holding it for some other guy."

¶ 26 The circuit court found defendant guilty on all three counts. The court determined that defendant's statement that "he was willing to *** basically take blame for the actions of the young lady" was not "an admission of knowledge," but still "a piece of evidence." The court found incredible defendant's testimony that he was willing to put utilities in his name and be incarcerated for a woman who has relationships with other men. It noted Caldwell had a vehicle, a good job, and money from a tax return, and could afford to pay the bills. The court found defendant's statement showed that he knew the firearm was his and did not want anyone else "to be blamed for it because, in his mind, at that time, *** the only two people that [could] be blamed" were he and Caldwell.

¶ 27 The court could not determine whether the photographed garments were men's or women's clothing, but found that defendant "was living [at the apartment] on some type of a part-time basis at least." The court further inferred that "defendant had a gun that was illegal," and Caldwell's place would be a "safe place" to keep it. The court emphasized that defendant stated that he lived at the apartment during a casual conversation at the traffic stop, and found defendant was at the apartment "enough" to have his personal items there.

¶ 28 Although "[a] lot of the evidence [was] circumstantial," the court found defendant's recorded statements were "proof that the gun was his." In so holding, the court discounted that (1) the firearm was recovered in a pink box, (2) no lease was produced, and (3) defendant did not possess keys to the apartment. The court believed the officers recovered a sufficient amount of defendant's belongings from the apartment to suggest he lived there "on a regular basis."

¶ 29    The court denied defendant's motion for a new trial. At sentencing, the court merged the UUWF count premised on possession of ammunition and the FOID card count into the UUWF count premised on possession of a firearm, and sentenced defendant to two years in prison on that count. The court denied defendant's motion to reconsider the sentence. This appeal followed.

¶ 30                                    ANALYSIS

¶ 31    On appeal, defendant argues that the State failed to prove him guilty of UUWF because the evidence failed to establish constructive possession.

¶ 32    When a defendant challenges a criminal conviction based on the sufficiency of the evidence, the reviewing court must determine whether, considering all evidence in the light most favorable to the prosecution, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The factfinder's role is to assess the credibility of witnesses, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the testimony and other evidence presented. *People v. Lara*, 2012 IL 112370, ¶ 46. We will not reverse a criminal conviction "unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Jones*, 2023 IL 127810, ¶ 28.

¶ 33    To sustain a conviction for UUWF as charged, the State needed to prove beyond a reasonable doubt that defendant (1) knowingly possessed the firearm, and (2) was previously convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2016).

¶ 34    Defendant only argues that the State failed to prove that he knowingly possessed the firearm. "[P]ossession may be actual or constructive." *People v. Givens*, 237 Ill. 2d 311, 335

(2010). Here, it is undisputed that defendant was not in actual possession of the firearm; therefore, the State had to prove constructive possession. To establish constructive possession, the State must show that defendant (1) knew of the firearm's presence, and (2) exercised immediate and exclusive control of the area where it was found. *Jones*, 2023 IL 127810, ¶ 30. Evidence of constructive possession is often solely circumstantial. *People v. Terrell*, 2017 IL App (1st) 142726, ¶ 18.

¶ 35    Defendant's knowledge may be shown through his actions, declarations, or conduct that supports an inference he knew the contraband existed in the place it was found. *People v. Hines*, 2021 IL App (1st) 191378, ¶ 32; see also *People v. Embry*, 20 Ill. 2d 331, 334 (1960). To establish that defendant exercised immediate and exclusive control of the area, it must be shown that he had the "intent and capability to maintain control and dominion" over it. (Internal quotation marks omitted.) *People v Freiberg*, 147 Ill. 2d 326, 361 (1992). "[P]roof that a defendant had control over the premises where contraband is located gives rise to an inference of knowledge and possession of that contraband." *Jones*, 2023 IL 127810, ¶ 30.

¶ 36    Viewed in the light most favorable to the State, we find the evidence was sufficient to establish defendant knowingly possessed the firearm. Specifically, evidence showed that defendant periodically stayed in the apartment and had immediate and exclusive control of the bedroom where the firearm was recovered. Proof of habitation tends to show control of the premises, raising an inference of knowledge and possession of contraband found therein. *Hines*, 2021 IL App (1st) 191378, ¶ 34.

¶ 37    Here, while executing a search warrant at the apartment, Born recovered a loaded firearm and a magazine with live cartridges from a dresser drawer in the bedroom. From a different drawer in the same dresser, Born recovered defendant's salary earnings statement, criminal history reports,

and various court documents with his signature. From a different dresser in the bedroom, Born recovered a People's Gas bill addressed to defendant at the apartment dated February 10, 2017, just 14 days prior to his arrest. From the living room, Born recovered additional mail from Comcast and People's Gas addressed to defendant at the apartment. "Evidence of residency or habitation often takes the form of rent receipts, utility bills, or mail." *Terrell*, 2017 IL App (1st) 142726, ¶ 19. From the dining area of the apartment, two pairs of jeans were recovered, which defendant admitted belonged to him. Further, Born testified that defendant told him that he resided at the building during the traffic stop the day prior to his arrest. In his recorded statement, defendant stated that he went to the apartment whenever he could get away and sometimes slept there, including the night before he was arrested, and he testified similarly.

¶ 38    Based on the totality of the evidence connecting defendant to the apartment, and construing all reasonable inferences therefrom in the light most favorable to the State, a rational trier of fact could reasonably conclude that defendant had knowledge of the firearm and controlled the area in which it was found. See *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17 (establishing defendant's habitation in the residence is sufficient to show defendant controlled the area); see also *People v. Swenson*, 2020 IL 124688, ¶ 35 (the reviewing court draws all reasonable inferences in the light most favorable to the State).

¶ 39    Defendant claims that the State failed to prove his control of the bedroom, arguing that he plausibly explained why the utility bill was in his name, and none of his personal items were recovered from the bedroom. However, the circuit court found otherwise, finding incredible defendant's testimony that he would obtain utilities in his name and risk incarceration for a woman who had relationships with other men and could afford to pay her bills. The court found that

defendant resided at the apartment at least part-time, emphasizing his willingness to obtain utilities, his admission to Born that he resided at the building, and the presence of his "things" in the apartment, which suggested he was there "on a regular basis."

¶ 40    As factfinder, the circuit court was free to accept or reject all or part of defendant's testimony. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 62. We will not substitute our judgment for the factfinder's. *People v. Aljohani*, 2022 IL 127037, ¶ 67. We find a rational trier of fact could reasonably infer from the evidence and testimony that defendant illegally possessed the firearm and chose to store it at the apartment. See *People v. Smith*, 191 Ill. 2d 408, 413 (2000) (the factfinder can rely on reasonable inferences of knowledge and possession to determine if the State established constructive possession).

¶ 41                                    CONCLUSION

¶ 42    In sum, the evidence demonstrating defendant's knowing possession of the firearm was not so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt that defendant was guilty of UUWF. We therefore affirm the judgment of the circuit court of Cook County.

¶ 43    Affirmed.