2023 IL App (2d) 220266-U
No. 2-22-0266
Order filed June 29, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 22-DT-26 |
| ANTHONY R. REHBOCK, | ) ) | Honorable Stephanie P. Klein, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant established a *prima facie* case for rescission of the summary suspension of his driver's license where he introduced evidence of the inaccuracy of the blood test. The trial court did not abuse its discretion in denying the State's motion for a continuance.

¶ 2    On February 6, 2022, defendant, Anthony R. Rehbock, was arrested for suspicion of driving under the influence of cannabis (DUI cannabis) (625 ILCS 5/11-501(a)(4) (West 2020)). The circuit court of Kendall County granted defendant's petition to rescind the resulting summary suspension of his driver's license. The State appeals, arguing that the trial court erred in determining that defendant made a *prima facie* showing that shifted the burden of proceeding to

the State and that the court abused its discretion in denying the State's request for a continuance. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On February 6, 2022, defendant was arrested for suspicion of DUI cannabis. Defendant submitted to blood testing, which was conducted by the Illinois State Police Crime Lab. On March 11, 2022, defendant's driver's license was summarily suspended and, thereafter, defendant received from the Secretary of State's office confirmation of the summary suspension. The summary suspension was based on the concentration of 9-delta-tetrahydrocannabinol (THC) exceeding five nanograms per milliliter of whole blood, and the arresting officer listed the basis for his belief that he had reasonable grounds to stop defendant for DUI. On March 21, 2022, defendant filed a petition to rescind the summary suspension, alleging, among other things, that the officer who arrested him did not have reasonable grounds to believe that he was driving while under the influence of cannabis and the blood test results were not accurate.

¶ 5      On April 5, 2022, the petition to rescind advanced to a hearing. Before the hearing commenced, the following colloquy occurred:

            "THE COURT: State ready?

            MS. JIRASEK [(Prosecutor)]: On the petition that's filed, yes.

            THE COURT: Defense ready?

            MR. KUNOWSKI [(Defense Counsel)]: Yes.

            MS. JIRASEK: If I could ask what grounds counsel's going on?

            MR. KUNOWSKI: Your Honor, I'm going on reasonable grounds and

      [defendant's] submitting to requested tests with the sample of blood alcohol concentration

to not indicate blood alcohol concentration of .08 or more, any amount of drugs, substance, or compound in blood, urine resulting from the unlawful use or consumption of cannabis as listed in the Cannabis Control Act, a controlled substance, as listed in the Illinois Controlled Substances Act, or an intoxicating compound as listed in the Use of Intoxicating Compounds Act, or a delta 9 tetrahydrocannabinol concentration of either 5 nanograms per [milliliter] or more of whole blood or 10 nanograms per [milliliter] or more of another bodily substance.

THE COURT: Does that clarify for the State?

MS. JIRASIK: It does, judge.

THE COURT: All right.

MS. JIRASEK: I would note, I believe, judge, based on everything as filed, we're still ready on that. There is no lab technician from the Illinois State Police Lab here, but I don't believe that would be the State's burden at this time.

THE COURT: Both parties have answered ready, so I expect both parties are ready."

¶ 6    The only witness to testify at the hearing on the petition to rescind was Deputy John Undesser of the Kendall County sheriff's office. Undesser testified that he observed defendant driving at inconsistent speeds—defendant would drive slowly under the speed limit, and then would accelerate and drive above the speed limit. When Undesser stopped defendant's car and approached, he could smell a strong odor of burnt cannabis. Defendant's eyes were bloodshot and glassy, and defendant admitted that he had smoked cannabis some unspecified time before the stop. Given the odor and the hazy appearance of the car windows, Undesser inferred that

defendant, his passenger, or both had been "clam baking"—smoking cannabis in the car with the windows closed. Defendant admitted to Undesser that he should have probably opened the windows a bit. Undesser also administered field sobriety tests to defendant and observed sufficient clues in some of the testing to draw the conclusion that defendant was impaired. Undesser then placed defendant under arrest.

¶ 7 Undesser administered to defendant the warning to motorists and advised defendant of his *Miranda* rights before requesting blood and urine samples. Undesser took defendant to a nearby hospital where blood and urine samples were taken and sent for analysis.

¶ 8 Undesser testified that he completed his sworn report based on the information he received from the Illinois State Police laboratory. The testing results were received by his supervisor via email, and the supervisor passed them along to Undesser. Undesser identified the lab report, and it was admitted into evidence without objection.

¶ 9 The lab report consisted of two pages. On the first page, the report stated that the lab received two test tubes of blood and two bottles of urine. For the blood test, the report listed that "Delta-9 Carboxy THC (THC metabolite) [was] detected" but was not quantified. It also listed "Delta-9 Tetrahydrocannabinol (THC) 5.6 ng/mL." Finally, it showed "No volatiles detected" in the blood sample. Regarding the urine sample, the report stated, "Cannabinoids detected."

¶ 10 The second page of the report discussed testing and methodology:

"Drug analysis has been limited to the following classes: Amphetamine, Benzodiazepine, Cocaine, Cannabinoid, Opiate, and Phencyclidine (PCP). If additional drug testing is required, a service request can be submitted using LIMS Prelog.

Volatile analysis of this case is limited to the following: Ethanol, Methanol, Acetone, and Isopropanol.

The estimated uncertainty for the Delta-9 Tetrahydrocannabinol (THC) quantitation is +/- 17.85% at the 99.73% confidence interval, resulting in a range of 4.6 to 6.6 ng/mL.

\*\*\*

Any analysis conducted is accredited under the *ISO/IEC 17025:2017 – Testing Laboratory* accreditation issued by ANSI National Accreditation Board (ANAB). Refer to certificate #FT-0240 and associated Scope of Accreditation. This report contains the conclusions, opinions and/or interpretations of the analyst(s) whose signature(s) appears on the report as authorization of the results. All testing was performed at the location listed in the header of this document, unless otherwise indicated in the Notes Packet. The 'Notes Packet' appendix of this report, available in Prelog, contains detailed information on the method(s) used, date(s) of testing, locations(s) of testing and environmental conditions associated with this analysis, if applicable. All evidence submitted to the laboratory will be returned upon completion of all service requests, unless otherwise indicated in the body of the report."

Casey Turney, a forensic scientist with the Illinois State Police laboratory, signed and certified the report "[u]nder penalties of perjury" as "true, correct, and complete." The "Notes Packet" was not included with the report admitted into evidence and does not appear in the record.

¶ 11 Undesser was questioned about the report. He was directed to the second page, and he read the estimated uncertainty passage into the record, and then he read the test results for the blood

samples into the record. Undesser was asked the meaning of uncertainty, and he replied, "Not for certain." The following colloquy between defense counsel and Undesser occurred:

"Q. Okay. So in the context of a lab result and filling out a form, did you know that that third paragraph [(the estimated uncertainty passage)] was in there in the lab result?

A. I had personally never read that, no.

Q. So that third paragraph mentioned something uncertainty [*sic*] or a margin of error, would you say that's about right?

A. That's correct.

Q. So how do you know that while [defendant] was driving that the amount in his blood was 5 nanograms or more with that sort of margin of error or variance?

A. Because I'm taking the lab report at face value like we do with most things."

¶ 12    On cross-examination, Undesser discussed his observations of defendant that led him to arrest defendant. Undesser also discussed his department's procedure for obtaining blood samples. If the subject were at the department, a phlebotomist from the department would take the blood sample there. If the subject were transported to a hospital, medical personnel from the hospital would take the blood sample. In either event, the arresting officer would observe the process of preparing the sample containers from a DUI kit, the taking of the samples, and the resealing of the DUI kit. Undesser testified that he observed the collection of blood and urine samples for the DUI kit and took the sealed kit to the department's evidence custodian, who sent the samples to the Illinois State Police Crime Lab. Undesser testified that he waited for the results from the lab, and, once he received them, he filled out the sworn report, issued traffic citations, and mailed the documents to defendant.

¶ 13     When questioned on cross-examination about the contents of the lab report, Undesser acknowledged that, on page two of the report, the result for the delta-9-THC test fell within the range of 4.6 – 6.6 nanograms per milliliter.  Undesser agreed that he used the value from the first page of the report and that it was standard procedure within the department to use the value from the first page of the report, which reflected the result of the scientist who performed the testing.

¶ 14     After Undesser's testimony, defendant played the deputy's dashcam recording from the encounter.  Defendant rested.

¶ 15     The State moved for a directed finding.  The State argued that the evidence adduced showed that there were reasonable grounds to arrest defendant.  The State also argued that defendant had not met his burden regarding the blood test results.  Specifically, the State noted that the blood was drawn according to standard procedures at a hospital, and testing on defendant's blood resulted in a determination that defendant had a blood concentration of 5.6 nanograms per milliliter of delta-9-THC, while the statutory threshold was only 5.0 nanograms per milliliter.  Defendant responded to the State's arguments.  Pertinently, defendant argued that the margin of uncertainty reported for the testing that was conducted was so large, that defendant's result "was right on the line."  The State argued in rebuttal that defendant had not produced anyone from the lab to testify about the meaning of the margin of error and how that impacted the testing.

¶ 16     The trial court granted the State's motion for directed finding regarding the issue of reasonable grounds.  Regarding the accuracy of the testing, the court explained:

"With regards to the second ground, the issue about the lab tests, I have had an opportunity to review the case that was presented by the State's Attorneys Office [*sic*], [*People v. Gryczkowski*, 183 Ill. App. 3d 1064 (1989)], I have also, although neither party

has argued it, I think we all bear in mind the case of [*People v. Orth*, 124 Ill. 2d 326 (1988),] which is often authoritative in petitions to rescind ***.

In [*Gryczkowski*], the defendant sought a rescission. One of the grounds, the one that's pertinent to our issue here today, on a breath, challenging the accuracy of the breathalyzer administered in that case. In attempting to sustain or make his *prima facie* case, the defendant in that case presented evidence that amounts to extrapolation evidence to show that at the time he was driving his blood alcohol level would not have been over the legal limit.

That evidence is different than the evidence that is at present in this case in that it did not actually challenge the accuracy of the test but challenged the meaning of the test, what the blood alcohol level result of the test meant.

Conversely, in this case, and the court has to make its determination based on the evidence that is actually before it, not what could or should or might be before it if things were different, what the court has presented before it and what was admitted into evidence was a laboratory report which appears to state that there is a margin of error of 17.85 percent.

As the court held in [*Orth*], where there is any evidence that tends to cast doubt on the test's accuracy, that that is sufficient to sustain the *prima facie* case.

The court does find that this is evidence that is credible because it comes from the State Lab, it is the same lab report that the State would like the court to rely on for the test result itself. The court cannot look at page 1 and not look at page 2. And so basing it on the evidence that I have before me, I do find that the defendant has sustained its [*sic*] burden

for a *prima facie* case on that ground and the State's motion for directed finding on that ground is denied."

¶ 17    The State asked for a continuance to bring in the nurse and the scientist to testify.  In support, the State argued that it would be unduly burdensome to have the nurse and scientist present at every rescission hearing.  The trial court agreed that having nurses and lab personnel present for every hearing would be unduly burdensome.  The court noted, however, that the State had answered ready, and persisted in its claim of ready even after defendant explained the bases on which he was proceeding in the rescission hearing.  The court denied the request, noting that the State could have clarified the extent to which it was ready when defendant expressed the grounds on which he would be proceeding, but it had not done so.

¶ 18    The State rested without producing any evidence.  The trial court granted the petition to rescind defendant's summary suspension.  The court entered written orders dated April 5, 2022, memorializing its decisions on the motion for directed finding, the petition to rescind, and the motion for a continuance.

¶ 19    On May 5, 2022, the State timely filed a motion to reconsider, challenging the trial court's decision on the accuracy of the blood test and the denial of its request for a continuance to obtain testimony from the nurse and the scientist who performed the testing on the blood samples.  On June 22, 2022, the State's motion to reconsider advanced to a hearing.

¶ 20    During argument on the motion, the State admitted that it had answered ready and knew the grounds on which defendant was choosing to proceed but persisted in claiming an undue burden in managing its witnesses for rescission hearings if the trial court was not "liberal in allowing continuances."

¶ 21    The trial court denied the motion to reconsider. The court first explained that it adhered to its reasoning from the rescission hearing regarding defendant's *prima facie* case on the accuracy of the blood testing. The court then turned to the continuance issue:

"on the day of the hearing, [defendant] indicated the grounds he was going on and both parties had answered ready and then there was a request for the articulation of the grounds which [defendant] provided.

This court inquired if that, in any way, affected the State's answer that they were ready for hearing and it was affirmatively stated that it did not. And this court, I think it trusts then that it was taking the parties at their word that they were ready.

There was nothing, no request made that, if the burden were to shift on that point, they did not have a lab person ready. As far as I know, there was no effort to see if the lab person could be available to perhaps appear via Zoom if the burden had shifted. As far as I could tell, the State was of the opinion that the defense would not be able to shift the burden which is certainly the State's—in their prerogative to assess their case the way they see fit, but this court is going to rely on representations of counsel when they say they are ready.

With regards to the issue brought up about a significant burden of requiring the State to have individuals here, again I don't know that the State requested any other procedures and simply just answered ready.

And as to the State having to notice the case up early for summary suspension [*sic*] hearing, I will point out that having spent the majority of my career in other jurisdictions, that is in fact actually what happens in every other county I have worked in aside from this

one where the State notices in a case and requests a hearing date from the judge. The State does not get to just pick their hearing dates as they do here. So it's a procedure that works here and I'm fine with going along with how things have been done here, but I do not find it would be unreasonable for the State to have to notice a case in early if they needed an answer on the record as to what grounds the summary suspension will be proceeding on.

¶ 22      So, for all of these reasons, the State's motion to reconsider is denied."

¶ 23      The trial court entered an order dated June 22, 2022, memorializing its judgment denying the State's motion to reconsider.

¶ 24      On July 22, 2022, the State, via the office of the Kendall County State's Attorney, filed a notice of appeal. The notice specifically lists only the April 5, 2022, order, but it further explains that the State appealed the orders dated April 5, 2022, granting defendant's petition to rescind and dated June 22, 2022, denying the State's motion to reconsider. On August 15, 2022, the State, via the Office of the State's Attorneys Appellate Prosecutor, filed an amended notice of appeal. The amended notice expressly added the June 22, 2022, order. The explanation of the orders appealed from remained substantively unchanged.

¶ 25                                    II. ANALYSIS

¶ 26      On appeal, the State challenges the trial court's judgment granting defendant's petition to rescind and denying the State's motion for a continuance. The State argues that the court's determination that defendant established a *prima facie* showing that his blood test was inaccurate was against the manifest weight of the evidence. The State also argues that the court abused its discretion in denying it a continuance after the court determined that defendant had established a *prima facie* case. We consider the contentions in turn.

¶ 27                              A. Jurisdiction

¶ 28    We have an obligation to determine whether jurisdiction is proper before discussing the merits, even if the parties have not questioned the existence of appellate jurisdiction. *Johnson v. Armstrong*, 2022 IL 127942, ¶ 18. In this case, on July 22, 2022, the State filed a timely notice of appeal. However, an amended notice of appeal may only be filed without leave of the appellate court if it is filed within the original 30-day period to file the notice. Ill. S. Ct. R. 303(b)(5) (eff. July 1, 2017). No motion for leave to file an amended notice of appeal appears in the record. On August 15, 2022, the State, without leave, purported to file an amended notice of appeal. Because the amended notice was not filed within the original 30-day period, it is untimely and ineffective to confer jurisdiction. *Id.*

¶ 29    We note, however, that Supreme Court Rule 303(a)(2) (eff. July 1, 2017) provides that, "where a postjudgment motion is denied, an appeal from the judgment is deemed to include an appeal from the denial of the postjudgment motion." Thus, the original notice of appeal is deemed to encompass the denial of the State's motion to reconsider. *Id.* In addition, the original notice of appeal expressly referenced both the April 5, 2022, order granting defendant's petition to rescind and the June 22, 2022, order denying the State's motion to reconsider. Thus, even without the amended notice of appeal, we have jurisdiction to consider the issues the State raises. We now turn to the merits of the State's contentions.

¶ 30                   B. Petition to Rescind and *Prima Facie* Case

¶ 31    The State argues that the trial court erred in determining that defendant had established a *prima facie* case that the blood test for cannabis consumption (delta-9-THC and THC metabolites) was inaccurate. Section 2-118.1 of the Illinois Vehicle Code (Vehicle Code) (625 ILCS 5/2-118.1

(West 2020)) provides the grounds available to a defendant to challenge and rescind a summary suspension of his or her license. Relevantly, a defendant may challenge the accuracy of the testing:

> "Whether the person, after being advised by the officer that the privilege to operate a motor vehicle would be suspended if the person submits to a chemical test, or tests, and the test discloses an alcohol concentration of 0.08 or more, a tetrahydrocannabinol concentration as defined in paragraph 6 of subsection (a) of Section 11-501.2 of this Code, or any amount of a drug, substance, or compound in the person's blood, other bodily substance, or urine." *Id.* § 2-118.1(b)(4).

In turn, section 11-501.2 provides: "Tetrahydrocannabinol concentration means either 5 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of whole blood or 10 nanograms or more of delta-9-tetrahydrocannabinol per milliliter of other bodily substance." *Id.* § 11-501.2(a)(6). Further, "[i]f there was a tetrahydrocannabinol concentration of 5 nanograms or more in whole blood or 10 nanograms or more in an other [*sic*] bodily substance as defined in this Section, it shall be presumed that the person was under the influence of cannabis." *Id.* § 11-501.2(b-5)(1).

¶ 32    The proceedings on a petition to rescind the summary suspension of a defendant's driving privileges are civil in nature. *People v. Sandoval*, 2022 IL App (2d) 220155, ¶ 17. The defendant bears the burden of proof and, if the defendant establishes a *prima facie* case for rescission, the burden is shifted to the State to present evidence in support of the suspension. *Id.* The trial court's factual findings will not be disturbed unless they are against the manifest weight of the evidence. *People v. Relwani*, 2019 IL 123385, ¶ 18. Likewise, the court's determination regarding the *prima facie* case will not be disturbed unless it is against the manifest weight of the evidence. *Id.* A

finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented. *Id.* The ultimate question regarding the rescission is reviewed *de novo*. *Id.*

¶ 33    A rescission may be premised upon the basis that the test results were unreliable. 625 ILCS 5/2-118.1(b)(4) (West 2020). A *prima facie* case may be established by presenting evidence of "any circumstance which tends to cast doubt on the test's accuracy, including, but not limited to, credible testimony by the motorist that he was not in fact under the influence of alcohol." *People v. Orth*, 124 Ill. 2d 326, 341 (1988). Once the defendant establishes a *prima facie* case, the burden shifts to the State to rebut the *prima facie* case. *People v. Massie*, 305 Ill. App. 3d 550, 554 (1999). The State may rebut the *prima facie* case that the testing was inaccurate with foundational evidence regarding the testing, or anything else that may rebut the evidence of inaccuracy. *Orth*, 124 Ill. 2d at 341. Of course, if the defendant fails to establish a *prima facie* case for rescission, whatever the basis, then the State is entitled to a directed finding denying the defendant's request for rescission. *Relwani*, 2019 IL 123385, ¶ 17.

¶ 34    In this case, defendant relied on the laboratory report from the State Police, arguing that the very terms of the report established its inaccuracy. As described above, the report included a discussion of the margin of error of the blood test, which was 17.85%. This meant that the value of the THC concentration in defendant's blood, to an extremely high degree of confidence (99.73%), was somewhere within the range of 4.6 to 6.6 nanograms of THC per milliliter of whole blood. The trial court determined that the inherent uncertainty of the result, with a significant portion of the range of the "true" THC concentration below the 5.0 ng/mL threshold, established a *prima facie* case for rescission based on the inaccuracy of the blood test.

¶ 35    Defendant presented evidence that falls squarely within the contemplation of *Orth*. *Orth* permits a defendant to introduce evidence "of any circumstance which tends to cast doubt on the test's accuracy." *Orth*, 124 Ill. 2d at 341. *Orth* expressly contemplated that a defendant could present "credible testimony by the [defendant] that he was not in fact under the influence of alcohol." *Id.* Here, defendant presented the test results, which the trial court expressly deemed credible, and which indicated that the blood test had a large degree of inherent inaccuracy. The blood test thus demonstrated that there was a significant possibility that the concentration of THC in defendant's blood was below the 5.0 ng/mL threshold. The trial court's determination finds ample support in the very terms of the lab report itself, and we cannot say the court's conclusion that defendant had presented a *prima facie* case for rescission was against the manifest weight of the evidence.

¶ 36    Having concluded that defendant presented a *prima facie* case for rescission, the burden shifted to the State to present evidence rebutting the *prima facie* case. *Id.* at 340. As an example, if a motorist seeking rescission of a summary suspension based on the inaccuracy of the breath test establishes a *prima facie* case, the State must present evidence of the proper functioning of the breath test machine and the conformity with prescribed procedures in administering the test. *Id.* Here, once the trial court determined that defendant had established a *prima facie* case that the blood test was inaccurate, the State rested without producing any evidence. Because the State provided no evidence to rebut defendant's *prima facie* case, the trial court properly granted defendant's petition to rescind. *People v. Aleliunaite*, 379 Ill. App. 3d 975, 982 (2008).

¶ 37    Before discussing the State's specific contentions, we pause to reiterate what our holding means. We emphatically are not saying that, in every case the range of values of a defendant's

blood concentration dips below the statutory maximum, the defendant has made a *prima facie* case for rescission. For example, if the margin of error was 1% and the concentration was 0.10 (meaning that the range of values was 0.099 to 0.101), and the statutory maximum is 0.10, then depending on the trial court's determination, there would be evidence to support either that the defendant had or had not established a *prima facie* case. In support of the failure to establish a *prima facie* case, the margin of error is small, the result of testing is at the statutory maximum, and the range of values rounds to 0.10, which is all that is required. Thus, a determination that the defendant had not established a *prima facie* case would not be against the manifest weight of the evidence. On the other hand, in support of establishing a *prima facie* case, the value is borderline, and the margin of error makes it abundantly possible that the defendant's "real" concentration is below the statutory maximum. These facts cast sufficient doubt on the accuracy of the test to shift the burden of proof to the State. Thus, a determination that the defendant had established a *prima facie* case also would not be against the manifest weight of the evidence.

¶ 38    This is to say that the result at trial is very much dependent on the evidence the parties are able to muster and the manner in which the trial court makes its decision. Our review is deferential but not a rubber stamp. Here, there is clear evidence that the margin of error is large, nearly 20%. There is no evidence in the record regarding the details of the testing and why the testing is subject to such a large margin of error. In light of the large margin of error, there is ample evidence of the inaccuracy of the testing, and the trial court's determination that defendant established a *prima facie* case for rescission is therefore not against the manifest weight of the evidence. We now turn to the State's specific contentions.

¶ 39    The State argues that this court, in *People v. Torres*, 160 Ill. App. 3d 543 (1987), disagreed "with the holding set forth in *Orth* and reiterated that the burden of proof with respect to foundational issues concerning the trustworthiness of test results rests with defendant." The State's argument fails to track because *Torres* was decided in 1987, almost exactly one year before *Orth* was decided in 1988. Indeed, *Orth* expressly affirms *Torres* and the placing of the burden to establish a *prima facie* case on the defendant moving for rescission. *Orth*, 124 Ill. 2d 338; *Torres*, 160 Ill. App. 3d at 645-46. Moreover, *Torres* deals with the burden of establishing a *prima facie* case, not what type of evidence is allowed to establish a *prima facie* case.

¶ 40    The State contends that *Torres* (*id.* at 647) supports its contention that defendant failed to establish a *prima facie* case because it held that the defendant had the burden of proof with foundational issues concerning the accuracy of test results. *Torres* held that the defendant failed to produce evidence to show that the police officer was not qualified to operate a breath test machine, and thus, failed to establish a *prima facie* case. *Id.* It was the failure to introduce evidence regarding the officer's qualifications that led to the failure to establish the defendant's *prima facie* case. *Id.* Here, by contrast, the laboratory report, which was admitted into evidence, demonstrated that the blood test had a large and inherent margin of error, and this evidence established defendant's *prima facie* case of inaccuracy. *Torres*, therefore, is inapposite.

¶ 41    The State also apparently argues that, to establish a *prima facie* case, a defendant must provide evidence demonstrating that some foundational aspect of the testing was not met, relying on *Torres*, *id.* at 646-47, *People v. Martin*, 161 Ill. App. 3d 472, 475 (1987), and *People v. Wilder*, 156 Ill. App. 3d 663, 667 (1987). As with *Torres*, *Martin* and *Wilder* predate *Orth*, and to the extent that they conflict with *Orth*, are not viable. *Orth* makes clear that evidence that the test was

unreliable "may consist of any circumstance which tends to cast doubt on the test's accuracy, including, but not limited to, credible testimony by the motorist that he was not in fact under the influence of alcohol." *Orth*, 124 Ill. 2d at 341. If the motorist's own testimony that he or she was not drinking suffices to establish a *prima facie* case, then evidence that the test at issue has a large and inherent margin of error, if found credible, will also suffice.

¶ 42 The State argues that defendant's contention that the blood test's margin of error established a *prima facie* case was only speculation and conjecture, citing *People v. Stanton*, 269 Ill. App 3d 654 (1995). In *Stanton*, the defendant asserted that the administration of intravenous fluids before the blood test was administered rendered the results inaccurate and established a *prima facie* case for rescission. *Id.* at 655. This court noted that there was no evidence of what the fluids were, how much was administered, or what the effect on a blood alcohol test might be. *Id.* We held that the argument was speculative because there was no testimony about the effect of the administration of the fluids, and the possibility that the blood test could have been affected was insufficient to carry the burden of establishing a *prima facie* case. *Id* at 657-58. Unlike in *Stanton*, the evidence admitted at the rescission hearing established that the THC concentration in defendant's blood was within a 4.6 – 6.6 ng/mL range. Thus, the evidence of inaccuracy comes from the lab report itself, not from some unexplained extrinsic agency that could have possibly affected the result. *Stanton* is inapposite.

¶ 43 The State argues that the trial court is essentially changing the terms of the statute by requiring the blood test result to show THC concentration greater than the margin of error—here, to be outside of the margin or error, the THC concentration would have needed to be 6 ng/mL or greater, and not the 5.0 ng/mL statutory threshold. In support, the State relies on *People v.*

*Robledo*, 2018 IL App (2d) 151142, ¶ 17. In *Robledo*, the defendant's breath test result was 0.082, and evidence established that the breath machine had a margin of error of plus or minus 0.005. *Id.* ¶¶ 4-5. The defendant argued that she was not proved guilty beyond a reasonable doubt because her blood alcohol concentration could have been as low as 0.077. *Id.* ¶ 8. This court rejected the contention, concluding that, because the jury heard the evidence, including the margin of error and the calibration results, the weight accorded the evidence was within the jury's province, and any rational trier of fact could have found that the defendant's blood alcohol concentration exceeded 0.08. *Id.* ¶ 18. We also rejected the defendant's margin-of-error contention as contrary to the legislative intent of setting the threshold at 0.08. *Id.* ¶ 17.

¶ 44 There are at least two difficulties with the State's contention. First, defendant herein argued that, because the margin of error was so large, the blood test result was inaccurate. However, the context in which this argument arose was the establishment of a *prima facie* case. The State had the opportunity to rebut defendant's *prima facie* case with evidence that the test was, in fact, accurate, and the actual THC concentration in defendant's blood was above the 5.0 ng/mL threshold. Thus, defendant was not attempting to effectively rewrite the statutory requirements. More importantly, in *Robledo*, the trier of fact made the determination that the State's evidence passed muster, leading the appellate court to conclude that the evidence was sufficient to support the conviction. *Id.* ¶ 18. Here, we have a similar circumstance. The trial court accepted the evidence defendant presented and determined that the evidence established a *prima facie* case. Above, we determined that the court's conclusion was not against the manifest weight of the evidence. Thus, *Robledo* supports, rather than conflicts with, our determination.

¶ 45　　The State argues that section 11-501.2(b-5)(1) of the Vehicle Code (625 ILCS 5/11-501.2(b-5)(1) (West 2020)) gives rise to a presumption that a defendant was under the influence of cannabis if the THC concentration in his or her blood was greater than 5 ng/mL, and thus, defendant failed to establish a *prima facie* case.  This argument ignores the fact that the blood test may be challenged for accuracy in a rescission hearing.  *Id.* § 2-118.1(b)(4), *People v. Stoffle*, 2020 IL App (2d) 190431, ¶ 23.  The State's argument also ignores that, if the accuracy of the blood test is challenged and a *prima facie* case is established that it may not be accurate, then no presumption that a defendant was under the influence of cannabis can arise, because it has not been established that the THC concentration was above the threshold.  We reject the State's argument.

¶ 46　　The State argues that the trial court misunderstood the evidence of inaccuracy, contending that Undesser testified "that he followed all the proper procedures for collecting the DUI kit" from the hospital and sending it to the Illinois State Police lab for analysis.  This argument misses the mark.  Defendant did not contend that Undesser had not followed the proper procedures, rather, defendant contended that the blood test was inaccurate as demonstrated by the large margin of error and the substantial range of possible true THC concentration values that were below the 5 ng/mL threshold.  Undesser's testimony about the procedures he followed has nothing to do with whether the analysis of defendant's blood returned accurate results.

¶ 47　　The State argues that the trial court should have taken the test results from the lab report at face value and assumed its accuracy.  The court stated that it "cannot look at page 1 [(with the result of 5.6 ng/mL)] and not look at page 2 [(with the information concerning the margin of error)]."  The trial court properly interpreted the information contained within the report and its

determination was not against the manifest weight of the evidence. We reject the State's contention.

¶ 48    The State argues that defendant's argument was rejected by this court in *People v. Davis*, 180 Ill. App. 3d 749 (1989). In that case, which was at least decided after *Orth*, the defendant asserted that, based on the Illinois Administrative Code, all breath test machines were required to be accurate to within plus or minus 0.01 to be certified and argued that this margin applied to her measured blood alcohol concentration of 0.10 (the applicable standard at that time). The trial court accepted the defendant's representation and rescinded her summary suspension. *Id.* at 750-51. This court noted that, while breath test machines were required to accurate to within a certain range, it did not follow that "all instruments err to that exact degree." *Id.* at 753. The court further noted that, even accepting that there was a 0.01 margin of error, that meant that the true blood alcohol concentration value could be above or below the threshold, and the trial court erred in assuming that the machine had made any error because the defendant presented no evidence that the machine involved in her test erred in any manner. *Id.* at 753-54. The court held that the trial court erred in accepting the idea that all breath test machines were accurate over a range of plus and minus 0.01 based on the accuracy figure from the Administrative Code, and it had thus misapplied the Administrative Code in rescinding the defendant's summary suspension. *Id.* at 755.

¶ 49    Here, defendant did not interject into evidence an unsupported claim that all apparatus used to perform blood tests for THC concentrations were generally inaccurate by plus or minus 17.85%—defendant drew the margin of error applicable to his specific blood test from the report itself. Moreover, the *Davis* court considered that the defendant presented no evidence that breath

test machine had erred or was inaccurate. *Id.* at 753-54. Here, by contrast, defendant presented evidence that the blood test was inaccurate using the report itself, which indicated the margin of error was 17.85%. The lab report was admitted into evidence. Unlike *Davis*, defendant here presented evidence that his specific test was inaccurate and did not rely on administrative guidelines about accuracy to establish a margin of error. *Davis* is therefore distinguishable.

¶ 50    The State argues that the trial court, consistent with the admonition in *Davis* (*id.*), should not have only counted the margin of error against the State, but should have considered that the true value of the THC concentration from the blood test was somewhere within 5.0 – 6.6 ng/mL, above the statutory threshold. The State overlooks that, in order to establish a *prima facie* case, a defendant need only present some evidence on every essential element of the ground asserted. *People v. Helt*, 384 Ill. App. 3d 285, 287 (2008). Here, defendant presented evidence, via the margin of error noted in the report, that his blood test results did not show him to be above the statutory THC threshold, and this evidence was sufficient to place in issue whether defendant in fact failed the chemical test. See *Stoffle*, 2020 IL App (2d 190431, ¶ 23 (among the limited issues that can be raised in a rescission hearing is whether the person failed the chemical test to which he or she submitted (quoting *People v. Moore*, 138 Ill. 2d 162, 167 (1990))). *Davis* does not speak to the circumstance that the results of the testing are uncertain; indeed, *Davis* is expressly premised on the fact that "the defendant produced no evidence whatsoever that the particular machine involved in her test *** erred in any manner." *Davis*, 180 Ill. App. 3d at 754. Here, by contrast, defendant presented evidence that the results of his blood test were not above the statutory THC threshold. We reject the State's argument.

¶ 51    The State cites *Relwani*, 2019 IL 123385, ¶¶ 20-22, *People v. Kurtz*, 171 Ill. App. 3d 1068, 1071 (1988), and *Martin*, 161 Ill. App. 3d at 474-75, for propositions concerning the ramifications of failing to establish a *prima facie* case.  The cases are inapposite.  In *Relwani* and *Kurtz*, the defendant failed to present evidence to support the grounds to establish the *prima facie* case.  Here, by contrast, defendant established a *prima facie* case by introducing evidence that the results of his blood test were inaccurate.  In *Martin*, the State was not obligated to put on evidence to rebut the defendant's *prima facie* case where the defendant had not established a *prima facie* case.  Here, because the defendant established a *prima facie* case, the burden shifted to the State to present evidence to rebut defendant's claim that the blood test was inaccurate.

¶ 52    The State argues that the trial court misapprehended and misapplied *Gryczkowski* in determining that defendant established a *prima facie* case.  According to the State, *Gryczkowski* places the burden of establishing a *prima facie* case on the defendant, and the defendant must present evidence that the police did not follow proper procedures, or the testing apparatus was not accurate or functioning properly.  *Gryczkowski*, 183 Ill. App. 3d at 1070-71.  The State's argument is irrelevant because we review the trial court's judgment and not its reasoning.  *People v. Aljohani*, 2022 IL 127037, ¶ 28.

¶ 53    To the extent that the State is arguing that *Gryczkowski* compels a different result, we disagree.  In *Gryczkowski*, 183 Ill. App. 3d at 1070, this court stated that, regarding whether the defendant established a *prima facie* case for rescission, the defendant "failed to introduce any evidence whatsoever that he was improperly tested. He also failed to introduce any evidence that the machine in question malfunctioned, or that the results obtained were inaccurate."  Thus, *Gryczkowski* commented on the defendant's failure to establish a *prima facie* case.  *Id.* at 1071

("[the] defendant failed to produce any evidence whatsoever to support his claims. It is not the State's responsibility to produce witnesses or evidence to support [the] defendant's challenge of the accuracy of a breathalyzer test result"). Here, the burden was on defendant, and defendant sustained his burden of proof.

¶ 54 The State also purports to discern that *Gryczkowski* requires a defendant to "present some evidence, separate from a test result itself, before the burden of proof [is] shifted to the State." We disagree. *Gryczkowski* follows *Orth*. *Id.* at 1070. *Orth* requires only that, "[w]here the motorist argues for rescission on the basis that the test results were unreliable, such evidence may consist of any circumstance which tends to cast doubt on the test's accuracy." *Orth*, 124 Ill. 2d at 341. This evidence may include, but is not limited to, "credible testimony by the motorist that he was not in fact under the influence of alcohol." *Id. Orth* thus provides a defendant with considerable leeway in attempting to establish the inaccuracy of the test result. Because *Gryczkowski* followed *Orth*, it could not have limited how a defendant could establish inaccuracy; rather, it simply reiterated that the defendant had the burden to establish the test's inaccuracy before the State would have to produce evidence to rebut the claim of inaccuracy. *Gryczkowski*, 183 Ill. App. 3d at 1071 ("the burden of proof rests on the defendant; the State has the task of rebutting the defendant's evidence"). *Gryczkowski* does not compel a different result.

¶ 55 Accordingly, we hold that the trial court's determination that defendant established a *prima facie* case for rescission of the summary suspension of his driver's license was not against the manifest weight of the evidence. At that point, the burden shifted to the State to rebut defendant's evidence. Because the State rested without producing any evidence, the trial court correctly rescinded the summary suspension.

¶ 56                                    C. Continuance

¶ 57     The State argues that the trial court abused its discretion in denying its motion to continue

the proceedings after the court denied its motion for a directed finding on the accuracy of the blood

test results.   The grant or denial of a continuance is a matter within the trial court's sound

discretion, and we will not disturb the trial court's decision absent a clear abuse of that discretion.

*People v. Walker*, 232 Ill. 2d 113, 125 (2009).

¶ 58     The State argues that the equities involved clearly favored a continuance under the

circumstances.  We note that *Orth* recognized that requiring the State to bring the arresting officers,

medical personnel, and scientists to the court for every rescission hearing would entail large costs

and divert them from their primary tasks, resulting in an unsustainable fiscal and administrative

burden.  *Orth*, 124 Ill. 2d at 336-37.  We agree that, without considering any circumstances of the

case at hand, trial courts should be liberally disposed to allow the State to assemble witnesses

based on the heavy burden that would be imposed by requiring the State to have the law

enforcement and technical witnesses in person at the beginning of every rescission hearing.  *People*

*v. Culpepper*, 254 Ill. App. 3d 215, 225 (1993).

¶ 59     However, our task is not to consider the correct policy to resolve a theoretical issue, but to

consider whether the trial court in this case abused its discretion in denying the State a continuance.

The record shows that, here, the State unqualifiedly answered that it was ready to proceed, and

then requested the grounds on which defendant would proceed at the rescission hearing.  Upon

learning the grounds, the State indicated that it was still ready to proceed and mentioned that there

was no scientist from the lab present.  The court expressed that it expected, since both parties

answered ready, that both parties would be ready to conduct the hearing, and the hearing

commenced. We note that the State did not qualify its assertion that it was ready to proceed, and it did not request time to assemble any other witnesses if defendant were to establish a *prima facie* case. Rather, the State persisted in its answer that it was ready to proceed, noted that it did not have any witness from the lab present, but restated that it was ready to proceed.

¶ 60    At the motion to reconsider, the trial court recalled also that the State did not try to arrange to have the scientist testify remotely or otherwise try to obtain the scientist's testimony. The report of proceedings for the rescission hearing bears out this recollection: the State made no effort to try to make some sort of alternate arrangement to procure the necessary testimony. Likewise, the State answered that it was unqualifiedly ready and did not attempt to establish any contingencies if defendant were able to establish a *prima facie* case.

¶ 61    *Orth* strikes a balance between the realities of requiring the scientist's testimony and the costs to the scientist's productivity by defaulting to the liberal allowance of continuances. However, this position is not a free pass—the State bears the burden of making such arrangements to the satisfaction of the trial court. Here, the trial court clearly indicated that it expected the parties to fulfill their representations that they were ready to proceed. Indeed, the trial court gave the State several clear opportunities to qualify that representation of readiness, but the State persisted in its unqualified representation that it was ready to proceed. The State noted that no laboratory personnel were present, but it did not seek to use the absence of personnel to condition its claim of readiness, and the State did not request a continuance or inform the court that it would need to do so if defendant met established a *prima facie* case for rescission. After making the inquiry, the court did not abuse its discretion in holding the parties to their representations. Had the State sought to qualify its readiness to proceed, *Orth* would have required the court to view the request

liberally. After providing several clear opportunities, the court was not required to shed its role as neutral arbiter and intercede on the State's behalf to correct what it seems to have perceived as a foolhardy representation of readiness in the absence of key witnesses should defendant be able to establish a *prima facie* case for rescission. Effectively, the State's argument boils down to a demand that the trial court save it from itself. That the court did not do so is not an abuse of discretion.

¶ 62    The State argues that the trial court erroneously believed that the State needed to request a continuance before the hearing commenced and that the denial of a continuance was contrary to the general policy expressed in *Orth* and *Culpepper* that a continuance should be liberally granted. The record does not support the State's contention. The record indicates that the trial court inquired as to readiness and the State indicated that it was prepared to proceed. When the State learned the grounds on which defendant was proceeding, it still indicated that it was prepared to proceed. The State further indicated that it did not have a witness from the lab present, but persisted in answering ready anyway and did not suggest that the lack of lab personnel would have any bearing on its ability to proceed. Thus, the State was given ample opportunity to qualify or explain any limits on its readiness to proceed but persisted in answering ready without qualification.

¶ 63    Further, we cannot say, based on this record, that the trial court abused its discretion. The court inquired if the State was ready to proceed. Once the State answered ready, the State asked for clarification on the grounds, and the court asked if that changed the State's position on readiness. The State persisted in indicating that it was fully ready, and the court indicated that it understood that the State would be ready to conduct the rescission hearing to completion. The

State had at least three opportunities, therefore, to modify its stance on readiness—either then requesting a continuance or else clarifying what the court expected if defendant established a *prima facie* case. The State availed itself of none of the opportunities, and instead, continued to answer ready. Therefore, the trial court did not abuse its discretion in relying on the State's representations that it was ready, in proceeding to a hearing, and in denying the State's subsequent motion to continue because, in fact, it was not ready. Based on this record, we cannot say that the trial court abused its discretion in denying the State's request for a continuance.

¶ 64    Accordingly, we affirm the trial court's decision on the State's motion for a continuance.

¶ 65                              III. CONCLUSION

¶ 66    For the foregoing reasons, we affirm the judgment of the circuit court of Kendall County.

¶ 67    Affirmed.